**In re DOW CORNING CORPORATION, Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court, E.D. Michigan, Northern Division.

July 16, 1996.

Barbara J. Houser, Dallas, TX, Craig J. Litherland, Houston, TX, Peter A. Nolan, Austin, TX, for Dow Corning Corporation.

Ogden N. Lewis, New York City, Sheryl L. Toby, Detroit, MI, for Unsecured Creditors' Committee.

Alfred S. Lurey, Dennis S. Meir, Atlanta, GA, Susan A. Cahoon, Atlanta, GA, for Tort Claimants Committee.

Craig Atchinson, Assistant Michigan Attorney General, Lansing, MI, for Department of Environmental Quality.

### OPINION ON DEBTOR'S MOTION FOR APPROVAL OF SETTLEMENTS WITH TEN INSURANCE COMPANIES

ARTHUR J. SPECTOR, Bankruptcy Judge.

### I. INTRODUCTION

Over the last several years, Dow Corning Corporation ("Debtor") was sued by thousands of individuals for personal injuries allegedly caused by the breast implants it manufactured and the materials it supplied to other breast implant manufacturers. The Debtor tendered the complaints to its many insurers who declined coverage on a number of grounds. At the time of this Court's decision, the Debtor and about a hundred of its insurers were enmeshed in a declaratory judgment action filed in Wayne County, Michigan Circuit Court over the dispute.

On May 15, 1995, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*[1] The declaratory judgment action continued despite the bankruptcy. On July 19, 1995, the Debtor filed a motion for approval of settlements it had reached with Royal Indemnity Company ("Royal") and with Hartford Accident and Indemnity Company, Hartford Fire Insurance Company, and Nutmeg Insurance Company (collectively "Hartford"). Time was of the essence because the trial court judge, Hon. Robert J. Colombo, Jr., had scheduled a hearing on August 11, 1995, at 9:00 a.m. to deliver his rulings on numerous dispositive motions, which would significantly affect the parties' bargaining positions. To avoid the risk inherent in those pronouncements, the parties insisted that their settlements be finalized before then. As a result, discovery was expedited, requests for continuances were denied and the Court remained in session until approximately 2:05 a.m. of August 11, 1995, at which time the orders approving the settlements were signed.

Approval of those settlements and particularly the one with Hartford, was opposed by several parties. However, the party whose opposition then remains relevant to the current matter is the Official Committee of Tort Claimants ("TCC"). Many of the points it made in conjunction with that contested matter were raised again here. Because of the extreme need for speed in approving the Royal and Hartford settlements findings, conclusions and explanations were verbal only. This opinion, which explains the Court's reasoning on these contested matters, will therefore serve double duty as it will more fully explicate the reasoning of the Court in August on the common issues of law raised.

In the first week of October, 1995, the Debtor filed another series of motions for approval of compromises and settlements, this time with ten other insurance companies. As to one of these settlements, no objection was raised. The other nine brought a number of objections, some of which have since been withdrawn. *See In re Dow Corning Corp.*, 192 B.R. 415, 28 B.C.D. 649 (Bankr. E.D.Mich.1996). Evidence was received on December 7, 8 and 11, 1995. After consideration of briefs, closing arguments were held on January 25, 1996. By that time, only two objectors remained: the TCC and the Michi-

---

1. Hereafter, all statutory references are to this act unless otherwise noted.

gan Department of Environmental Quality ("DEQ").[2] There was a need for an expeditious decision this time, too, because the trial of the declaratory judgment action began on November 1, 1995, and was due to (and did) end in early February, 1996. The settling defendants were severed from the trial with the proviso that if the settlements were not approved, a trial as to these defendants would be held at a later time. Therefore, the Court's ruling was again oral only, with the announcement that this opinion would follow.

## II. THE SETTLEMENTS

The current motion, like the one in August, proposed two different kinds of settlements. First, as with the Debtor's settlement with Royal in August, the settlement with American Guarantee and Liability Insurance Company in October provided that the insurer would agree to abide by the terms of the policy, including indemnification of the Debtor for claims submitted, in return for a discount off the policy limits. This type of settlement is called a "coverage in place" settlement; the TCC did not object to its approval.[3] The second type of settlement, which was used with the other settling insurers, including Hartford, involves a cash payout by the insurer in return for certain releases from all entities listed as "insured" on the policies as well as complete releases by all tort claimants. In return, the Debtor agreed to discounts ranging up to approximately 24% off the face amount of the policies' coverages. The specifics of the nine contested compromises are summarized as follows:

**2.** The Unofficial Physicians' Committee also filed an objection. Representations were subsequently made by the Debtor's expert witness at the December 7, 1995 hearing that this objection had been withdrawn. Since lead counsel for the Unofficial Physicians' Committee did not attend the hearing and its local counsel did not object to such representations by the Debtor's witness, it is fair to conclude that its objections were indeed withdrawn.

**3.** According to one of the Debtor's witnesses, the Debtor's experience after settling on a "coverage in place" basis has been "miserable." The insurer has been nitpicky and very reluctant to pay

### A. Settlement With the London Market Insurers

**1.** Each London Market Insurer[4] will pay its respective share of the total settlement amount within 60 calendar days of court approval of the agreement. The total settlement amount is said to be $233,000,000. However, the amount attributable to participating London Market Insurers and which is the amount that will actually be paid as part of this agreement is $182,000,000. Approximately $51,000,000 was apparently allocated to non-participating London Market Insurers and will not be paid as part of the agreement. The Debtor has the option to terminate the agreement if the amount paid within the 60–day period is not at least $180,000,000.

**2.** In return, the Debtor will release each insurer for all liability associated with breast implant claims and claims involving any other type of Dow Corning implant. The Debtor will also provide a complete release of the products/completed operation hazard limits of the policies. In addition, the Debtor will release all environmental claims with respect to certain policies in effect prior to 1964, and certain policies that have paid 50% or more of their liability limits.

**3.** The Debtor and the London Market Insurers will each waive certain claims against the other and the Debtor will commit to seek from other settling insurers a waiver of any contribution or other claims such other insurers might have against the London Market Insurers with respect to the released subject matter identified above. The Debtor will also reduce the amount of any settlement with—or judgment against—other settling insurers by the amount of any contribution

claims as submitted under the terms of their agreement.

**4.** The term "London Market Insurers" is being used to refer to insurers who have entered into contracts of insurance with the Debtor and who are either underwriters and syndicates at Lloyd's of London or a company doing business in the London Insurance Market. However, this term does not include all of the underwriters or insurance companies within the London Market that have entered into contracts of insurance with the Debtor. A number of such insurers chose not to participate in this settlement agreement.

or indemnity award against the London Market Insurers by such other insurers.

4. The Debtor will obtain a provision in the bankruptcy court order which would release the London Market Insurers from claims of any other insured, including Dow Chemical Company, Corning, Inc. and Hoechst–Marion–Roussel for all product liability claims up to the limits of insured loss as set forth within the agreement, and a provision which would release the London Market Insurers from claims of any other entities who may claim to be insureds under the policies (such as certain implant surgeons) as well as from any other entities claiming derivatively through the Debtor.

5. The Debtor will use its best efforts to include in any plan of reorganization a channeling injunction to protect the London Market Insurers from additional third-party claims on policies released pursuant to the settlement.

6. Treatment of the settlement proceeds will be as provided in an agreement between the Debtor and its co-insureds, which was approved by this Court on January 25, 1996. *See In re Dow Corning,* 192 B.R. 415, 28 B.C.D. 649 (Bankr.E.D.Mich.1996).

**B.** *Buy–Out Settlements With the Other Insurers*

1. The other Settling Insurers agree to pay the following amounts:

 a. Algemene Verzekering Maatschappij Diligentia N.V. Te Amsterdam—$11,250;

 b. Arab Insurance Company—$500,000;

 c. North River Insurance Company, United States Fire Insurance Company and International Surplus Lines Insurance Company (the "JU Insurers")—$40,181,147;

 d. Federal Insurance Company—$13,900,000;

 e. Ludgate Insurance Company Limited—$1,000,000;

 f. The National Casualty Company—$712,885;

 g. Transamerica Insurance Group—$24,700,000; and

 h. Zurich Insurance Company and Zurich International Ltd.—$3,800,000.

Each of these insurers must pay the above amounts within 15 calendar days after approval by the bankruptcy court. The one exception to this is the JU Insurers, who have until 42 days after the bankruptcy court's approval to make payment to the Debtor.

2. In return, the Debtor will release all liability associated with breast implant claims and claims involving any other type of Dow Corning implant. The Debtor will also release the products/completed operation hazards limits under the policy(ies) of the settling insurer. Additionally, the Debtor will also waive other contractual claims arising out of the breast implant litigation, including consequential damage claims.

3. The Debtor will obtain a provision in the bankruptcy court order which would release the Settling Insurer from claims by any other insured or underlying claimant to the same extent that the Settling Insurer is released by the Debtor, except that the release as to Dow Chemical and other entities claiming to be insureds under the policies of the Settling Insurer are releases only to the extent that the product liability limits of policies of the Settling Insurer are released by the Debtor.

4. All of the provisions stated in paragraph (3), (5) and (6) in the description of the "Settlement With the London Market Insurers," *supra,* pp. 219–20, are also included in these settlements.

The District Court has jurisdiction over this case and the contested matters which arise therein. 28 U.S.C. § 1334. Pursuant to E.D.Mich.L.R. 150.1(a), the District Court has referred its jurisdiction over the case to this Court, as provided for by 28 U.S.C. § 157(a). These contested matters are core proceedings. 28 U.S.C. § 157(b)(2)(A), (N), (O). What follows are the Court's findings of fact and conclusions of law, pursuant to F.R.Bankr.P. 7052.[5]

---

5. Although this opinion is presented in narrative form, it should be apparent most of the time

when a statement is a finding—e.g., that the settlements were the product of good-faith hard

### III. DEQ'S OBJECTIONS

■ DEQ objected to the part of the settlement with the London Market Insurers that cashes out the environmental coverage for $5 million because no provision exists for earmarking those funds for environmental cleanup. Although the DEQ did not go so far as the TCC in asserting a property interest in such insurance coverage (and ergo the proceeds thereof), its argument must assume some form of entitlement to earmarking. At this time, however, the argument is too speculative to be credited. If the time should come that DEQ has a real, live claim against the Debtor which would have triggered coverage under these policies, and which the Debtor has not satisfied through other resources, it may then be heard to argue about a loss. In such event, and assuming that it prevails, DEQ might then be entitled to a super-priority. *See, e.g.,* 11 U.S.C. § 364(b).

### IV. TCC'S OBJECTIONS

The TCC's objections are of three major types. The TCC attacked the economic wisdom of the settlements. It also asserted that the Court lacks the power to impose a release of the tort claimants' rights to sue the settling insurers. And it argued that even if the Court has such power, it could only be exercised after notice to each and every one of the claimants; thus, the procedure here denies them due process. The power of the Court and due process objections apply to all nine contested settlements. The economic arguments primarily relate to the settlements with the London Market Insurers, the Transamerica Insurance Group, the JU In-

surers, the Federal Insurance Company and the Zurich Insurance Company.

### A. Are the Settlements Reasonable?

■ The TCC claimed that the settlements, which are for slight discounts off of the product liability coverage limits, are economically unreasonable because the insurers face a risk of *unlimited* liability to the Debtor under their general liability coverages. Its main point was that the Debtor failed to exert sufficient leverage in the negotiating process arising from this risk.[6]

In regard to the settlement with the London Market Insurers, the TCC objected that the discount off of the products liability coverage limit was unreasonably high and that the complicated structure of the settlement made it virtually impossible to determine exactly how much coverage was being compromised.

### 1. Standard for Approving Settlements

■ Compromises are favored by the law. *Martin v. Kane (In re A & C Properties),* 784 F.2d 1377, 1381 (9th Cir.1986). They are also a normal part of the reorganization process. *Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) ("In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.").

---

bargaining—and when it is a conclusion of law—e.g., that the tort claimants have no independent property interest in the Debtor's insurance policies. Sometimes, however, it is very difficult to determine whether something is a fact to be "found" or law to be "concluded." In those cases, if the "something" is determined to be a fact, the Court hereby "finds" it; if it is an issue of law, then the Court hereby "concludes" it; in mixed questions of law and fact, the issue is simply "determined."

**6.** It is not entirely clear to which settlements this objection applies. In a Memorandum filed December 4, 1995, the TCC stated that it only objected to the economic reasonableness of the settlements with the five insurers listed above. Memorandum of [TCC] In Opposition to the

Debtor's Motions for Approval of Compromise of Controversy with Various Insurers, p. 2. Then in a response filed December 11, 1995, the TCC stated that "[a]mong the Committee's economic objections to the nine 'buy-out' settlements ... is that [the Debtor] is releasing supportable claims for substantial additional insurance coverage for breast implant claims without receiving any value for such release." Response of [TCC] to the Memorandum on Insurance Coverage Issues Filed by the Debtor in Support of the Debtor's Motions to Approve Compromises with Various Insurers, p. 1. However, as a practical matter, given the Court's rejection of the TCC's unlimited liability theory, whether the objection goes to one or all of the settlements is irrelevant.

■ A bankruptcy court should only approve a proposed settlement upon determination that the settlement is both "fair and equitable," *TMT Trailer*, 390 U.S. at 424, 88 S.Ct. at 1163, and in the "best interest" of the estate. *Connecticut General Life Ins. Co. v. United Companies Financial Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir.1995). In *Dow Corning*, 192 B.R. at 421, this Court articulated the general guidelines for determining whether the above standard has been met:

> When considering whether to approve a proposed settlement, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable. The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is reasonable." *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th Cir.1988) (citing *In re American Reserve Corp.*, 841 F.2d 159, 162–63 (7th Cir.1987)).

However, the court need not conduct a "mini trial on the merits . . . of [the] settlement." *[In re] Drexel Burnham Lambert [Group, Inc.]*, 134 B.R. [493] at 496 [ (Bankr.S.D.N.Y.1991) ]; *In re Energy Coop., Inc.*, 886 F.2d 921, 927 n. 6 (7th Cir.1989). Instead, the obligation of the court is to "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *Drexel Burnham Lambert*, 134 B.R. at 497 (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.1983), *cert. denied, Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983)).[7]

■ Any factor "relevant to a full and fair assessment of the wisdom of [a] proposed compromise" should be considered by the bankruptcy court. *TMT Trailer*, 390 U.S. at 424, 88 S.Ct. at 1163. However, in determining whether a proposed settlement agreement is fair and equitable, courts have found the following factors to be the most pertinent:

7. Since the Debtor analogized these settlements to a sale of assets pursuant to § 363, the TCC asserted that the proper standard to apply is not the "lowest point in the range of reasonableness." Instead, the TCC maintained that the Court must apply the standard for approving a sale, which it says is the best sales price that could be obtained for the bankruptcy estate. Memorandum of TCC, pp. 16–17. As will be discussed below, the Court concludes that the current settlements are the same as, and not just analogous to, a sale of the Debtor's assets pursuant to § 363(b). However, this conclusion has no effect upon the Court's determination of whether the settlements meet the necessary standard for approval.

Some courts say that a sale of the debtor's assets should be approved if it is "fair and equitable" and "in good faith." *See, e.g., In re Phoenix Steel Corp.*, 82 B.R. 334, 335 (Bankr.D.Del. 1987). Alternatively, some say the sale should be approved if it is in the "best interests of the estate." *See, e.g., In re Ancor Exploration Co.*, 30 B.R. 802, 808, 10 B.C.D. 1025 (N.D.Okla.1983); *WBQ Partnership v. Commonwealth of Virginia (In re WBQ Partnership)*, 189 B.R. 97, 105, 27 B.C.D. 1200, 34 C.B.C.2d 674 (Bankr.E.D.Va. 1995); *In re Embrace Systems Corp.*, 178 B.R. 112, 123 (Bankr.W.D.Mich.1995). Others—even some of those which also stated the test more liberally—have couched the proper standard for approving a sale in terms of the estate obtaining

the best price possible under the circumstances. *In re Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir.1985); *In re WPRV–TV, Inc.*, 143 B.R. 315, 321 (D.P.R.1991), *order vacated* 165 B.R. 1 (D.P.R.1992); *WBQ Partnership*, 189 B.R. at 105; *Embrace Systems, supra*. Though each of these tests may be worded somewhat differently, they are really just applications of the same business judgment test, and each test will render the same result. And since approval of a settlement also seems founded upon the business judgment test, *see In re Sanner Contracting Co.*, 181 B.R. 465, 470 (Bankr.D.Ariz.1995) (court approved settlement which reflected that trustee had used appropriate business judgment); *In re Apollo Steel Co.*, No. 94 B 2361, 1994 WL 713697, at *9 (Bankr.N.D.Ill. Dec. 19, 1994) ("If the proposed settlement is within the range of reasonable possible outcomes were the matter tried on its merits, or at least within the range of reasonable business judgment considering cost and litigation hazard, the settlement should ordinarily be approved."), it appears that the test for approving a settlement is not appreciably different from the test for approving a sale.

Moreover, even if the standard for approving a sale is higher than the standard for approving a settlement, it is really a moot point in the context of these proceedings, for the settlements satisfy not just the lowest point, but the highest point in the range of reasonableness. Consequently, even if the best sale price is the appropriate standard, it has been satisfied.

1. The balance between the likelihood of the plaintiff's or defendant's success should the case go to trial compared to the present and future benefits offered by the settlement;

2. The prospect of complex, costly and protracted litigation if settlement is not approved;

3. The proportion of class members who do not object or who affirmatively support the proposed settlement;

4. The competency and experience of counsel who support the settlement;

5. The relative benefits to be received by individuals or groups within the class;

6. The nature and breadth of releases to be obtained by officers and directors; and

7. The extent to which the settlement is the product of arm's length bargaining.

*In re Texaco Inc.*, 84 B.R. 893, 902, 17 B.C.D. 483 (Bankr.S.D.N.Y.), *appeal dismissed* 92 B.R. 38 (S.D.N.Y.1988); *see also Foster Mtg., supra.*

▮▮▮ The bankruptcy court's determination of whether to approve a proposed settlement must be supported by thorough, in-depth analysis of all relevant factors, so as to reflect an adequate and intelligent consideration of the merits of the settlement. *TMT Trailer,* 390 U.S. at 434, 88 S.Ct. at 1167–68; *Dow Corning,* 192 B.R. at 422. Discussion of the factors relevant to the settlements at issue follows.

### 2. *How the Settlement Amounts Were Reached*

The actual settlement amounts agreed to by the Debtor were reached in the following manner. First, the tort claims pending against the Debtor were projected to have a total value of $5 billion. (The Debtor was careful to point out that this projected liability figure was merely for purposes of determining potential insurance coverage, and that it did not admit to this amount of liability or for that matter to any liability.) On the other hand, the TCC protested that this number was far lower than its estimate of the Debtor's liability. As a practical matter, the $5 billion figure was chosen because it reaches the maximum amount of insurance coverage that would be available within the "products hazard" provision under any scenario. In other words, even if the Debtor's liability were ultimately determined to be greater than $5 billion, the amount of coverage available would remain unchanged. Using this number as the starting point for calculating available coverage was therefore reasonable.[8]

Next, the product hazard coverage available was discounted based upon an 8% discount rate over a four year period. The resultant number was the present value of available coverage. Selection of present value discount parameters always involves a certain amount of subjectivity. And since the TCC was unable to demonstrate that using an 8% discount rate over four years was unreasonable, or even that different parameters would have been more reasonable, these parameters are acceptable. Finally, a discount (or premium) was determined for each settlement by finding the percentage difference between the present value of available coverage and the actual settlement amount.

The largest discount, approximately 24% less than the available products hazard coverage, was given to the London Market Insurers. Though the discount may seem large, it is justified by the present instability of the London Insurance Market.

Paul Evans, a partner with Price, Waterhouse of London who specializes in insurance insolvencies, was called to testify by the Debtor regarding peculiarities with the London Market Insurers. The future of the London insurance market is considered uncertain due to a large and unusual number of

---

8. The total projected liability used in connection with the Hartford settlement was $3 billion. Negotiations with the London Market Insurers were ongoing at the time of the Hartford hearing and this was the estimate originally used for these negotiations as well. It is not clear from the record whether subsequent negotiations with the London Market Insurers used the $5 billion figure. However, there has been no showing that the $3 billion figure is unreasonable. This is particularly true in connection with the London Market Insurers' settlement. *See* n. 9 *infra,* discussing financial difficulties facing London Insurance Market.

claims leading to an unprecedented number of insolvencies among these insurers. Because the Debtor fears it will be unable to collect any judgments it may ultimately receive against some of these companies,[9] it chose to accept a settlement calling for a greater discount than it allowed other insurers. It also accepted other non-standard provisions, such as the $5 million allocation for environmental claims and the four-year payment term for one of the companies.

The other settlements ranged from discounts of 9.9% to premiums (over present value) of 36.1%. Determining whether these settlements are reasonable first requires an examination of the risk faced by the Debtor in the insurance litigation.

### 3. Legal Issues Favoring Settlement

There were two legal issues of tremendous significance in the insurance litigation which were decided favorably to the Debtor. Because the policies at issue are occurrence-based, the question of when the injury occurred is crucial. The Debtor argued that, for purposes of insurance coverage, the injury occurred when implantation occurred. The insurers argued that there was no occurrence until personal injuries manifested themselves. The other important issue was whether each policy is obligated to pay all damages which accrue even after the policy term expires, as the Debtor maintained, or whether, as the insurers wanted, damages must be allocated. For example, if a claim occurred within the policy term but 90% of the damages occurred after coverage expired, could the Debtor collect 100% of the damages or only 10%?

Judge Colombo ruled in favor of the Debtor on both of these issues. Scott Gilbert, a partner with the law firm of Covington and Burling, and who is perhaps one of the leading attorneys specializing in the resolution of complex insurance disputes, testified without impeachment that if the former issue (the "trigger" question) had been resolved against the Debtor, its insurance coverage would have been eviscerated. He also testified that had the allocation issue been decided adversely to the Debtor, it would have greatly reduced the amount of damages the Debtor could recover.

Although the Debtor prevailed on these issues, (and after jury verdict in its favor on numerous others), one can reasonably expect the remaining defendants to appeal. And due to recent appellate decisions, the Debtor's chances of retaining its trial court victories is anything but certain. The testimony of Michael Aylward, a partner in the Boston law firm of Morrison, Mahoney and Miller, representing Transamerica Insurance Group, is instructive. He testified that his client would have appealed the trigger issue to the Michigan Supreme Court had it not settled the litigation. He expressed confidence that the insurers' theory would be well received in the Michigan Court of Appeals based upon his reading of a series of recently decided cases.

9. After the Court's ruling of January 25, 1996, certain events have been reported in the press which lend support to the Debtor's fears about the collectibility of Lloyd's names. *See, e.g.:* "Lloyd's Sued For Fraud By Three States," *The National Law Journal,* p. B1 (March 18, 1996) (describing actions by various of the United States to halt Lloyd's of London's efforts to fund its rescue plan); "Lloyd's of London Woes Prompt Worry on Part of U.S. Regulators," *Detroit Legal News,* p. 8 (May 1, 1996) (discussing the instability of Lloyd's of London); "Lloyd's Members in U.S. Have a Right To Sue in This Country, SEC Contends," *The Wall Street Journal,* p. B5 (May 8, 1996) (reporting that successful assertion of SEC's position could jeopardize Lloyd's reconstruction attempts); "Lloyd's of London Raises Settlement to $4.72 Billion," *The Wall Street Journal,* p. A16 (May 13, 1996) (reporting that Lloyd's could "cease to exist in its present form" if a settlement with its "names" is not approved this summer and that some names have already stated that the new offer does not go far enough.); "Lloyd's of London Increases Settlement Offer to Investors," *Detroit Legal News,* p. 5 (May 15, 1996) (noting in connection with Lloyd's of London's new $4.7 billion settlement offer that: (1) some names contend the offer falls short; (2) "Lloyd's executives acknowledge the insurer faces a bleak future—or none at all—if the plan does not succeed"; and (3) a settlement must be approved by August, when Lloyd's must "pass solvency tests required by British regulators"); "Lloyd's Suffers Legal Setback," *The Wall Street Journal,* p. A14 (May 20, 1996) (reporting that a ruling of a British High Court judge "strengthens the hand of dissident investors demanding improvement to a [$4.7 billion "rescue plan"] settlement package.").

In *Transamerica Ins. Co. v. Safeco Ins. Co.*, 189 Mich.App. 55, 472 N.W.2d 5 (1991), Mr. Aylward's client brought an action against Safeco seeking a declaration that the defendant was liable for a *pro rata* share of the costs and ultimate liability incurred in the defense of claims brought against Frost–Guard Insulation, Inc., arising out of its installation of urea formaldehyde foam insulation (UFFI) between 1977 and 1982. Both parties had insured Frost–Guard under general comprehensive liability policies during various portions of this period. The plaintiff argued the exposure theory, which was similar to the Debtor's successful argument before Judge Colombo. But the defendant's motion for summary disposition (equivalent to a F.R.Civ.P. 56(c) motion) was granted. The Court of Appeals affirmed the trial court that "bodily injury, for purposes of triggering coverage, occurs when the symptoms begin or manifest themselves to the homeowner." *Transamerica v. Safeco,* 189 Mich.App. at 59, 472 N.W.2d 5. (It remanded for trial on when those injuries manifested.)

Mr. Aylward would have argued to the Michigan Court of Appeals that there is no basis to distinguish its decision in *Transamerica v. Safeco* dealing with UFFI, from the Debtor's insurance litigation involving silicone gel breast implants on the question of when an injury occurs under the insurance policies. And Mr. Gilbert testified that the Debtor has cause for concern that the lawyers for the non-settling defendants will make such an argument. This fear is magnified by a recent unpublished Michigan Court of Appeals decision which reaffirmed its trigger holding in the *Transamerica* case.

In *Cello–Foil Prods, Inc. v. Michigan Mut. Liab. Co.,* No. 151615, 1995 WL 854728 (per curiam) (Mich.Ct.App. Aug. 15, 1995) (unpublished), the plaintiff was the owner of the Thomas Solvent Annex in Battle Creek, a site contaminated by hazardous wastes. It sued various insurance companies, asserting that they had a duty to defend and indemnify the plaintiff from environmental contamination claims raised against it and 93 other offsite generators of hazardous waste that was dumped at the site and eventually contaminated the ground water supply. Reaffirming its earlier decision in *Transamerica v. Safeco,* the Court of Appeals held that the circuit court's dismissal of the action against all of the defendant insurance companies was proper because an injury occurs on the manifestation date and not when the underlying acts which eventually led to manifestation of injuries may have occurred.[10]

Given these precedents on the trigger issue and the apparent lack of Michigan appellate precedent on the allocation issue, the Debtor faces a significant possibility of losing all it has won so far on the merits. It therefore has a very strong interest in settling cases now. The TCC offered, and could offer, no solace or reasonable assurances to the Debtor that rolling the dice on the eventual outcome of its lawsuits against these insurers would in retrospect be viewed as a prudent decision. That the Debtor, as fiduciary of this estate, chose not to risk further litigation is not one which can be reasonably questioned.

The Debtor gains another advantage by settling: it gets lots of money right away. Had the settlements not been reached and the cases against the settling insurers gone to trial, even if the Debtor's judgment survived all appeals, the Debtor would not necessarily receive any money. Aside from requiring the insurers to defend the Debtor, the policies merely obligate the companies to indemnify the Debtor against any losses it suffers from the covered events. The insurers would argue that until the Debtor had paid or was at least adjudged liable to pay money damages to the tort claimants, they have no duty to part with any money. In one case, *UNR Indus. v. Continental Cas. Co.,* 942 F.2d 1101 (7th Cir.1991), it was held that an order confirming a chapter 11 plan which provided that the insured debtor transfer something of value (in that case 63% of the stock of the reorganized company) to a class of creditors was tantamount to a "judgment or settlement ... [which] triggers [the

---

**10.** And after Mssrs. Aylward and Gilbert testified, yet another decision of the Michigan Court of Appeals reaffirmed the manifestation theory in latent injury cases. *See Gelman Sciences, Inc. v. Fidelity & Cas. Co.,* 214 Mich.App. 560, 543 N.W.2d 38 (1995) (toxic waste).

insurer's] insurance obligations." *Id.* at 1104–1105. Confirmation of a plan in this case may take quite some time. In the meantime, the insurers, and not the Debtor, would be earning interest on the hundreds of millions of dollars which are now being paid to the Debtor.· And the insurers would certainly contest the *UNR* holding here. If the Sixth Circuit eventually disagreed with the Seventh Circuit on this issue, the Debtor could wait quite a while indeed for the money which these settlements provide immediately.

### 4. *Were Supportable Claims for Additional Insurance Coverage Released Without Receipt of Benefit?*

The TCC also asserted that the Debtor "is releasing supportable claims for substantial additional insurance coverage for breast implant claims without receiving any value for such release." Response of the [TCC] to the Memorandum on Insurance Coverage Issues Filed by the Debtor in Support of the Debtor's Motions to Approve Compromises With Various Insurers, p. 1. To understand this assertion it is necessary to have at least a basic understanding of the nature of the insurance policies involved.

The involved policies covered a period of time from 1962 through 1985 and are "comprehensive general liability" ("CGL") policies. These are "occurrence" policies, which means that they provide coverage "if the act or neglect giving rise to liability occurred during the period of the policy, regardless of when the act or neglect was discovered or a claim filed with the insurer." Robert H. Jerry, *Understanding Insurance Law* p. 286–87 (Matthew Bender 1987).[11] As a result, occurrence policies are potentially accessible to pay for injuries that do not immediately manifest themselves (such as the injuries alleged in this case), if such injuries are found to have occurred during the coverage period.

For the most part, the Debtor's comprehensive general liability policies have two separate components which are relevant to the current dispute.[12] The first is the "products liability" or "products hazard" component. This component of the policies would provide coverage in the event that one of the Debtor's products causes injury after it has been completed and sent to market. The products liability coverage is subject to two important restrictions. The first is a coverage limit per "occurrence". The second is an "aggregate" limit, which is the maximum amount of products liability coverage that the policy provides regardless of the number of occurrences.

The second relevant component is the "general liability" portion of the policies. One can describe the "general liability" component as providing coverage to an insured when there is a premises- or operations-based claim. Like the products liability component, the general liability provision is subject to a per occurrence liability limit. However, there is no limit on the number of occurrences for which the insurer may be required to provide coverage. Consequently, the insurer's potential liability is much greater under the general liability provisions.

The Debtor and the insurers negotiated the present settlements under the belief that coverage was available to the Debtor only under the products liability provisions of the policies. However, the TCC argued that a number of the bases of liability asserted by breast implant claimants, such as negligent failure to warn "about certain propensities and characteristics of silicone gel breast implants" should also be covered by the general liability provisions of the policies. Response of the [TCC] at p. 3. According to the TCC, therefore, the settlements are unreasonable

---

11. In contrast, the Debtor's post–1985 insurance coverage (which is not part of the current settlement) is primarily "claims-made" coverage. Therefore, the post–1985 insurance policies only "provide coverage if the act or neglect is discovered and brought to the insurer's attention during the policy term, regardless of when the act occurred." Jerry, *Understanding Insurance Law* at 287.

12. In addition to products liability and general liability coverage, some of the Debtor's CGL policies also contain coverage for intentional torts such as defamation, false imprisonment and malicious prosecution, that would otherwise be excluded under so-called "expected and intended" clauses. These coverages are not in issue here.

because the Debtor did not explore all of the potential available coverage.

In support of its position, the TCC cited a number of cases where the "general liability" provision of a policy provided coverage when it was found that the insured had negligently failed to warn of a particular danger involved in using its product. In *Devich v. Commercial Union Ins. Co.*, 867 F.Supp. 1230 (W.D.Pa.1994), the insured was a manufacturer of aerial work platforms which were repossessed by a secured creditor. During a demonstration for a potential buyer, an employee of the creditor was severely injured when a platform malfunctioned and threw him to the ground. *Id.* at 1231.

The state court found that the employee's "injuries were proximately caused by [the insured's] negligent failure to warn [him] of known defects" and entered a judgment against the insured for $859,078.33. *Id.* at 1233.[13] The insurer, however, denied coverage on the ground that the negligent failure to warn claim "was excluded from coverage under the [general liability] policy pursuant to the products-completed operations hazard exclusion. . . ." *Id.* The employee then brought suit against the insurer in federal court. The court held that since the state court judgment rested on the fact that the injury was caused by the insured's negligence, and not that the platforms were defective, the products liability exclusion did not preclude coverage. *Id.* at 1233–35. The court further stated that:

> The fact that the same facts could have given rise to a product related claim is irrelevant; nothing in [Pennsylvania's] prior case law suggests that such claims must be asserted under strict liability theories rather than negligence theories. Indeed, there appears to be no restriction on even requiring an election between theories; rather, both may be pursued in a single suit.

*Id.* at 1234 (quoting *Harford Mut. Ins. Co. v. Moorehead*, 396 Pa.Super. 234, 251, 578 A.2d 492, 501 (1990)).

In *Harford*, the insurer brought a declaratory judgment action seeking a determination of its duty to defend the insured. 578 A.2d at 493. The underlying action against the insured involved an allegation that the insured had negligently failed to warn of the danger involved in the improper use of one of its products. *Id.* at 501. The general liability policy involved provided coverage for all damages resulting from bodily injury. *Id.* at 495. But the insurer contended that it had no duty to defend or provide coverage because the "Products Hazard exclusion contained in the subject policy was intended to exclude coverage of an action brought against the insureds which alleged injuries sustained as a result of products [they had] sold. . . ." *Id.* at 494. The court disagreed and held that when "a claim is brought under the auspices of a 'negligent failure to warn,' it is appropriate to view the complaint as one charging improper conduct, and not one making a defective product, despite arguable similarities between such claims." *Id.* at 501.

The other case cited by the TCC, *Scarborough v. Northern Assurance Co. of America*, 718 F.2d 130, 132 (5th Cir.1983), also involved an assertion that the insured had negligently failed to warn "of the dangers involved in the use of its product." Once again, the insurer argued that the products hazard exclusion contained in the general liability policy precluded coverage of the claim. And like the courts in *Devich* and *Harford*, the court held that there was coverage, stating that "[t]he exclusion is inapplicable to injury resulting from the use of a product which does perform the functions and serve the purposes which the insured seller or manufacturer intends for it to perform or serve." *Id.* at 136.

The insurance policies in this case are governed by Michigan law. And although the TCC failed to cite any Michigan cases, the rule of law set forth in *Devich, Harford* and *Scarborough*, would appear to apply in this jurisdiction as well. In *Atkins v. Hartford Accident & Indem. Co.*, 7 Mich.App. 414, 151 N.W.2d 846 (1967), a pharmacist was sued

---

**13.** The complaint originally filed by the employee asserted claims under theories of strict liability and negligence. However, during trial the employee withdrew all claims based on strict liability and proceeded on the negligence claim alone. *Devich v. Commercial Union Ins. Co.*, 867 F.Supp. 1230, 1232–33 (W.D.Pa.1994).

for negligently selling pills containing a habit-forming drug. The insurer maintained that coverage under the comprehensive general liability policy owned by the pharmacist was excluded by the products hazard provision contained therein. 7 Mich.App. at 416–17, 151 N.W.2d 846. The court, however, found that the exclusion did not apply: "There was nothing inherently dangerous about the pills, if used with the proper instructions. Therefore, but for the negligent sale of the pills, the injury would not have occurred. The sale, although negligent ... was properly within the general liability clause of the insurance policy...." *Id.* at 418, 151 N.W.2d 846. *But cf. Gregory v. Cincinnati Inc.,* 450 Mich. 1, 11, 538 N.W.2d 325 (1995) (failure to warn of dangers involved in using a product "renders the product defective.").

At first glance, the TCC's argument is quite compelling, but closer scrutiny renders the theory questionable. First, contrary to the situation here, the cases relied on by the TCC all deal with products hazard (or products liability) *exclusions.* Under Michigan law, because "[a]n insurance company cannot be found liable for a risk it did not assume," clear and unambiguous exclusions will be enforced. *Group Ins. Co. of Michigan v. Czopek,* 440 Mich. 590, 597, 489 N.W.2d 444 (1992); *see also Heniser v. Frankenmuth Mut. Ins.,* 449 Mich. 155, 161, 534 N.W.2d 502 (1995) ("An insurer is free to define or limit the scope of coverage as long as the policy language fairly leads to one reasonable interpretation and is not in contravention of public policy."). However, if an ambiguity in an exclusion does exist, the language will "be strictly construed against the insurer." *Auto Club Group Ins. Co. v. Marzonie,* 447 Mich. 624, 631, 527 N.W.2d 760 (1994) (quoting *Czopek,* 440 Mich. at 597, 489 N.W.2d 444); *Auto–Owners Ins. Co. v. Churchman,* 440 Mich. 560, 567, 489 N.W.2d 431 (1992). The policy behind this construction is to ensure "that the purpose of insurance shall not be defeated. It has been deemed that an insurer should not be allowed, by the use of obscure phrases and exceptions, to defeat the very purpose for which the policy was procured." 43 Am.Jur.2d, Insurance, § 291.

The insurance policies at issue here do not contain products hazard exclusions. Instead, they specifically provide the Debtor coverage for claims brought against it that fall within the products hazard provision. However, the policies do place an aggregate limit on the total amount of products liability risk that the insurers were willing to accept in exchange for the premiums paid by the Debtor.

 "An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Churchman,* 440 Mich. at 566, 489 N.W.2d 431 (citing *Eghotz v. Creech,* 365 Mich. 527, 530, 113 N.W.2d 815 (1962)). "The intention of the parties must be deduced from the entire agreement, not from any part or parts of it, and, where a contract has several stipulations, the intention of the contracting parties is not expressed by any single clause or stipulation, but by every part and provision in it, which must all be considered together, and so construed as to be consistent with every other part." *Harrow Products, Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1025 (6th Cir.1995) (quoting *Johnston v. Miller,* 326 Mich. 682, 688, 40 N.W.2d 770 (1950)); *Auto Club Ins. Ass'n v. Lozanis,* 215 Mich. App. 415, 419, 546 N.W.2d 648 (1996). "When the language is clear and unambiguous on its face and does not offend public policy, [the court] simply appl[ies] the terms as written." *Marzonie,* 447 Mich. at 630, 527 N.W.2d 760 (citing *Churchman,* 440 Mich. at 567, 489 N.W.2d 431). Moreover, the "[c]ourt cannot create ambiguity where none exists." *Churchman,* 440 Mich. at 567, 489 N.W.2d 431. The reason for this, of course, is that the court cannot "countenance holding an insurance company liable for a risk it did not assume." *Marzonie,* 447 Mich. at 631, 527 N.W.2d 760.

Though there are many different insurance contracts involved in these contested matters, the parties agree that the following excerpts from a Hartford policy are standard:

The [insurer] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as dam-

ages because of ... bodily injury ... to which this insurance applies, caused by an occurrence....

TCC Exhibit 26, at page 8.

"Occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury ... neither expected nor intended from the standpoint of the insured....

*Id.* at 3.

"Products hazard" includes bodily injury ... arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury ... occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others....

*Id.*

[T]he total liability of the [insurer] for all damages because of ... all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the schedule as "aggregate."

*Id.* at 9.

As stated previously, when interpreting an insurance policy, the court is duty-bound to "effectuate the intent of the parties," if such intent can be deduced from consideration of the agreement as a whole. The unambiguous import of the policy language above is that the parties intended to place a limit on the insurer's total liability for all damages resulting from all bodily injuries included within the products hazard definition. And the products hazard definition includes bodily injuries arising from use of the insured's products.[14]

There can be little argument that the injuries alleged by tort claimants in this case stem from use of the Debtor's products. This is true regardless of the name given to the cause of action by the claimant. *See, e.g., Allstate Ins. Co. v. Johnson,* 205 Mich.App. 495, 500, 517 N.W.2d 799 (1994) ("[W]e look to the underlying cause of the injury to determine [insurance] coverage and not to the

specific theory of liability.") (quoting *Allstate Ins. Co. v. Freeman,* 432 Mich. 656, 690, 443 N.W.2d 734 (1989), *modified on other grounds,* 433 Mich. 1202, 446 N.W.2d 291 (1989)). Even the TCC's key expert witness, Donald Malecki, conceded this point during cross-examination. *See* Tr. of December 11, 1995 hearing, p. 163.

■ Virtually all products liability claims could conceivably include a "failure to warn" claim. If the products hazard aggregate limit could be avoided by simply changing the cause of action's name, then this provision of the insurance contract would become essentially meaningless. "A patently unreasonable interpretation of a contractual ambiguity will not be employed merely to allow the insured to recover his losses." *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 208, 476 N.W.2d 392 (1991) (quoting *Smith v. Lumbermen's Mut. Ins. Co.,* 101 Mich.App. 78, 83, 300 N.W.2d 457 (1980)).

There is nothing new about the theory of double or separate recovery espoused by the TCC. The theory relies upon policy language which has existed in insurance agreements for some fifty years. *See* Tr. of December 11, 1995 hearing, p. 165. And the TCC's expert witness, Donald Malecki, has suggested the theory to clients in the past. *Id.* at 165–66. Yet he was unable to identify a single situation like this one where the theory was applied successfully during "either settlement or litigation." *Id.* at 166. The theory had not even "increased the value of any settlement or litigation by as much as one penny in the last 50 years." *Id.* Mr. Gilbert testified unequivocally that the only coverage ever available to the Debtor as against insurers who insured it for general liability and product liability relevant to the implant claims were the product liability policies. He testified that he is familiar with the dual coverage arguments made by the TCC and had in fact made them himself in other cases since the early 1980s. He explained that general liability coverage can be, but is not always mutually exclusive of product lia-

---

**14.** For what it is worth, apparently the Debtor and the insurers read the policy language consis-

tent with this understanding.

bility coverage. A dual coverage argument can have merit in situations, for example, where someone is injured by inhaling asbestos fibers when installing asbestos insulation. In his opinion and the opinion of his firm, such an argument in this case would be frivolous and he therefore refused to make it. It is, therefore, not surprising that the TCC failed to cite any cases where an insured was able to obtain dual or separate coverage in a situation like that involved here.

In the only cases where the precise issue—dual coverage—was litigated to reported decision on facts similar to those here, *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.),* 149 B.R. 997 (Bankr.M.D.Fla.1993); *Fibreboard Corp. v. Hartford Accident & Indem. Co.,* 16 Cal.App.4th 492, 20 Cal.Rptr.2d 376 (Ct.App.1993), the theory was rejected. In both cases, the insurers acknowledged liability under the product liability coverage but denied it under the general liability coverage. In *Celotex,* the debtor contended that insurance coverage for the various plaintiffs' allegation that it had negligently failed to "warn of the potential hazards arising from [its] asbestos-containing products ... [was] not subject to the limits of liability imposed by the products hazard provisions." 149 B.R. at 999. In rejecting the debtor's argument the court stated:

> [A]side from countering the clear language of the policies at issue here, Debtor's theory would create certain logical inconsistencies in interpreting the policies as a whole. Under Debtor's theory, if Debtor is found liable under both strict liability and negligence theories, it would have the benefit of coverage under the general liability and the products liability provisions. The happenstance that an injured party raises a theory of liability which does not require a showing of a defective or inherently dangerous product should not permit Debtor to circumvent the clear limitations placed upon coverage for product-related injuries. Such a windfall certainly was not contemplated by the parties when the contract was executed....

*Id.* at 1002.

In *Fibreboard,* after exhausting the products hazard coverage under its CGL policy, the insured "assert[ed] that claims based on theories such as ... failure to disclose hazardous nature of products ... are not subject to the limits of liability for 'products hazard.'" 16 Cal.App.4th at 500, 20 Cal.Rptr.2d 376. The court soundly rejected the insured's arguments stating that "[w]ithin ... the continuum of coverage provided for liability stemming from operations and products, it is obvious that the traditional products claims [such as] ... failure to warn ... are within the four walls of the 'products hazard' clause." *Id.* at 502, 20 Cal.Rptr.2d 376. The court further added:

> Construing each policy as a whole, we conclude it is unreasonable to align activities concerning failure to warn of products hazards, suppression of product safety information, conspiring to market unsafe products, and the like within the ambit of operations coverage rather than products coverage.
>
> After all, an underlying condition which rendered the products defective and led to the property damage at issue was failure to warn of inherent dangers.
>
> If the planning and decisions that render the product defective are allocated to operations instead of products liability, then the policy distinction between the two coverages is lost.

*Id.* at 509–10, 20 Cal.Rptr.2d 376. Noteworthy is the fact that under Michigan law a failure to warn of dangers involved in using a product "renders the product defective." *Gregory v. Cincinnati Inc.,* 450 Mich. at 11, 538 N.W.2d 325.

Further support for the notion that when the alleged injury stems from use of the insured's product the only coverage available to the insured is under the "products hazard" provision is found in one of the leading treatises on insurance law.

> Clearly a company which writes an ordinary liability policy does not want a risk extending without end as a result of work performed or merchandise sold; nor, conversely, would a company willing to undertake the products risk want to assume the general liability burden. (footnote omitted)

7A Appleman, *Insurance Law & Practice* § 4508, p. 334 (Rev. ed. 1979 and Supp.1995).

It is scarcely just either to deprive a purchaser of the protection he is entitled to receive or to extend one type of coverage to fit a completely different situation from that contemplated. (footnote omitted)

*Id.* at 335.

[I]t is well to recognize that products liability is a coverage. that takes over where premises-operations leaves off by means of the various applicable exclusions. Obviously, if the insured carries premises-operations coverage as well as products and completed operations coverage there would be little litigation.

*Id.* at 340.

Thus once a product has been completed and sent to market, or a service has been performed liability may be incurred by reason of a defect in merchandise or improper workmanship. It should be clear that the premises-operations coverage is not an appropriate coverage and the individual now needs "products liability" or "completed operations" coverage. The coverages are complementary and not overlapping and the premiums are separate and distinct.

*Id.* at 341.

In products liability coverage or hazard the focus should be on the location of the occurrence that produces the bodily injury or property damage and not on the theory of liability. Thus, even though there has been a negligent manufacture or sale of goods but the accident occurs after possession has been relinquished and away from the premises, it is a products and completed operations hazard. (footnote omitted)

7A Appleman, *Insurance Law and Practice* § 4508.01, p. 346.

This Court is not now called upon to issue a definitive ruling on the matter. Instead, the focus is on whether the Debtor acted reasonably when it chose not to pursue the separate coverage theory. The Debtor stated that it considered the possibility of "coverage for the underlying claims ... under insurance other than [the products hazard provision], but determined there was no

credible basis for pursuing such coverage." Dow Corning Corporation's Memorandum of Law Concerning Certain Objections to Proposed Settlements Made by [TCC], p. 2. In light of the so far unsuccessful track record of such an argument in cases like this, the Court must conclude that the Debtor's decision not to pursue the separate coverage was reasonable, and that it lost nothing of value in not pursuing it.

The essence of the TCC's complaint is that the defendant had a cause of action for unlimited coverage under the general liability policies and so any settlement that did not factor in value for the loss of that cause of action was unreasonably small. But, especially with respect to the second round of settlements, this reasoning is specious for another reason.

When the defendant filed its motions for approval of these compromises, the start of the declaratory judgment trial was only three weeks away. When the motions for approval of the compromises were finally heard and decided in January, 1996, the trial was almost over. Even if the claim that the insurers faced possible liability to the debtor under the general liability policies were colorable, by the time the settlements were reached, the Debtor had little leverage because this theory had never even been pled.

Like those in the federal system, Michigan court rules are designed to facilitate amendment to pleadings, except in cases where the opposing party would be prejudiced. *Int'l Brotherhood of Electrical Workers, Local Union No. 58 v. McNulty*, 214 Mich.App. 437, 447, 543 N.W.2d 25 (1995). Consequently, when a court has presided over extensive and complicated discovery, has decided multiple complex dispositive motions and then set the matter for trial only a few days away, it is extremely likely that a motion for leave to amend complaints against about a hundred defendants in order to add a new, so-far-uniformly-unsuccessful cause of action would be denied and that the denial would be affirmed. *See Ben P. Fyke & Sons v. Gunter Co.*, 390 Mich. 649, 656, 213 N.W.2d 134 (1973) (particularized reasons for denying leave to amend include "undue delay, ... undue prejudice to the opposing party by

virtue of allowance of the amendment, [and] . . . futility of amendment. . . .") (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). This, of course, would be even more certain if the motion were made during trial. *See Dacon v. Transue,* 441 Mich. 315, 333, 490 N.W.2d 369 (1992) (Once the trial begins, the right to freely amend a complaint is no longer available.).

■ A court reviewing the business judgment of a trustee or debtor in possession in accepting a settlement of a controversy must look at the facts as they exist at the time of the settlement and not how they might have existed had the pre-petition debtor done something different a year or two before. The trustee must play the cards he/she is dealt. Because Dow Corning had never sued for general liability coverage and could not likely expect an amendment to add it to the trial, the Debtor–in–Possession (*qua* trustee) could not have demanded value from the insurers in return for releasing them from such coverage. In this case, therefore, the settlements obtained by the Debtor–in–Possession from the cards which the pre-petition debtor dealt were the best that could be accomplished under the circumstances. Accordingly, its judgment should be ratified.

### 5. *Summary of Factors*

In conformity with those cases that seem to dictate that a court consider a checklist of factors, *see* pp. 222–23, *supra,* the following is the Court's recapitulation of the points previously made, laid out in a checklist fashion.

**1. The balance between the likelihood of the plaintiff's or defendant's success should the case go to trial compared to the present and future benefits offered by the settlement;**

The "case," in essence, actually went to trial and the Debtor largely prevailed. However, its likelihood of ultimate victory after appeal is problematic. On the other hand, the benefits offered by the settlements are real and substantial and, in this Court's view, clearly outweigh the Debtor's likelihood of ultimate success.

**2. The prospect of complex, costly and protracted litigation if settlement is not approved;**

If the settlements are not approved, the Debtor will have to proceed to trial against these insurers. The last trial lasted almost four months. The issues left for trial are many and complex. This factor lends support to the settlements.

**3. The proportion of class members who do not object or who affirmatively support the proposed settlement;**

The Official Committee of Unsecured Creditors supported the settlement. The TCC opposed it. Go figure what that means in terms of "proportion." *See Dow Corning,* 192 B.R. at 423–24.

**4. The competency and experience of counsel who support the settlement;**

The competency and experience of Mssrs. Gilbert and Evans are extraordinary and impressive. Although their clients' interests, of course, shade their objectivity, the corroborating testimonies of Mssrs. Aylward for Transamerica and Norman Kleinberg, a partner at Hughes, Hubbard & Reid, for Hartford, were also valuable. This is meant to take nothing away from Mr. Malecki, who from all accounts must be the father of many of the insurance policies' forms—or at least many of the clauses and paragraphs therein—which are in litigation here. However, even he, called as an expert witness for the objecting TCC, could not say that the settlements were unreasonable.

**5. The relative benefits to be received by individuals or groups within the class;**

This factor seems to be irrelevant.

**6. The nature and breadth of releases to be obtained by officers and directors; and**

This factor seems to be irrelevant.

**7. The extent to which the settlement is the product of arm's length bargaining.**

There is absolutely no doubt that these settlements are the products of arm's length bargaining. The Debtor retained an extremely competent, enormous, and expensive

law firm to sue more than 100 insurance companies, who retained extremely competent counsel of their own. There were literally dozens of defenses asserted against the Debtor, some of which could have been independently dispositive of the lawsuit. The trial judge found it necessary to appoint a special settlement master whose participation was credited as being active and important. The negotiations were described as "[a]rduous, very intense and they continued over extensive periods of time, usually with the aid of the settlement master. Very hard fought." Tr. of August 10, 1995 hearing (testimony of Mr. Kleinberg), p. 195. *See also id.* (The negotiations were conducted in "[u]tmost good faith and if my arms could be any longer they ... would. They were extremely arm's length."); Tr. of December 8, 1995 hearing, p. 155 (testimony of Mr. Aylward) ("The negotiations were conducted at "arms length" and in "good faith"). Mr. Aylward testified that the settlement was the largest one he or Transamerica had ever concluded under a property or casualty policy. On behalf of the Hartford, Mr. Kleinberg said essentially the same thing. Tr. of August 10, 1995 hearing (testimony of Mr. Kleinberg), p. 156. This factor lends strong support to the motion for approval.

For these reasons, the Court concluded that the settlements are the best that could have been accomplished, are fair and equitable, are of great benefit to the estate, and were appropriately approved.

### B. *Property Right?*

The TCC further attacked the economic reasonableness of the settlements on the ground that tort claimants possess a property interest in the Debtor's insurance policies. As such, it asserted that the Debtor's agreement to provide "releases" of the tort claimants "independent" rights of action against the insurers, such as bad faith claims, was a valuable concession for which the Debtor was not compensated. Therefore, the amount the Debtor will receive is unreasonably low. The testimony introduced by the Debtor explained how it was the term "release" became part of the settlements. Mr. Gilbert testified that there were settlement negotia-

tions under way in the spring of 1995 before the Debtor filed bankruptcy. At that time, the insurers with whom the Debtor was then negotiating insisted upon an indemnity clause whereby the Debtor would agree to hold the insurer harmless against any claims filed by tort claimants directly against the insurer. Because neither party considered that the tort claimants had any basis to assert claims against the insurer, no value was given during the negotiating process for the hold harmless provision. Once the Debtor filed chapter 11, however, the insurers realized that an unsecured indemnity agreement by the Debtor was somewhat hollow. Therefore, in lieu of the indemnity agreement, they requested a release and channeling injunction provision as now appears in the settlement agreements. Both the insurers and the Debtor continue to hold to the view that the tort claimants have no causes of action against the insurers and in this Court's comments on August 11, 1995, with regard to the Hartford insurance settlements, the Court concurred in that estimate. In this opinion, the Court has amplified its reasoning for that conclusion.

The two other types of objection raised by the TCC in opposing all of the cash payout settlements also stem from its belief that each one of its constituents has a property interest in the Debtor's insurance policies. As a result, the Debtor cannot compromise these policies by delivering releases of the tort claimants' individual interests in the policies, nor does a court have the authority to issue an order which would permit the Debtor to do so. As a corollary, it asserted that notice of the motions for approval of the compromises should have been sent to each tort claimant, which was not done here.

### 1. *Authority Relied on By TCC to Support Assertion That Tort Claimants Have a Current Property Interest in Debtor's Insurance Policies*

Before the due process argument can be fully addressed, the Court must determine whether each individual who holds an unliquidated disputed personal injury claim against the Debtor has a property interest in one or more of the Debtor's insurance poli-

cies which provide coverage for personal injuries. Except with respect to Louisiana plaintiffs, to be addressed later, *see* n. 20, *infra*, the TCC asserted that the primary basis for this position is the following statute:

> In ... [casualty] liability insurance policies there shall be a provision that the insolvency or bankruptcy of the person insured shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of such policy, and stating that in case execution against the insured is returned unsatisfied in an action brought by the injured person or his or her personal representative in case death results from the accident, because of such insolvency or bankruptcy, then an action in the nature of a writ of garnishment may be maintained by the injured person, or his or her personal representative, against such insurer under the terms of the policy for the amount of the judgment in the said action not exceeding the amount of the policy.

Mich.Comp.Laws § 500.3006; Mich.Stat.Ann. § 24.13006.[15]

It is plain that the statute provides a person who was injured by one owning a casualty insurance policy with a right to garnishee the insured. But this right does not even arise until the claimant has reduced his or her claim to judgment against the insured tortfeasor and has obtained an unsatisfied execution against the tortfeasor's property. The TCC has not shown—nor has anyone alleged—that there exists a person anywhere in the world who meets those criteria in this case. It therefore would appear beyond dispute that this statute provides no tort claimant a property interest in any of the Debtor's insurance policies.

The case primarily relied upon by the TCC, *New Amsterdam Cas. Co. v. Jones*, 45 F.Supp. 887 (E.D.Mich.1942), *aff'd* 135 F.2d

191 (6th Cir.1943), only supports this reading of the statute, since the injured third party there was a judgment creditor. Other cases applying Mich.Comp.Laws § 500.3006; Mich.Stat.Ann. § 24.13006 reflect a similar understanding of this statute. *See, e.g. Meirthew v. Last*, 376 Mich. 33, 40, 135 N.W.2d 353 (1965) ("When plaintiff recovered her judgment against [defendant], she succeeded under [§ 500.3006] to [defendant's] herein affirmed rights and thereupon became possessed of right to proceed, as the statute says, against the insurer by 'an action in the nature of a writ of garnishment'...."); *Davis v. Great American Ins. Co.*, 136 Mich.App. 764, 767, 357 N.W.2d 761 (1984) (Pursuant to § 500.3006, "plaintiffs could have brought a garnishment proceeding against defendant in order to satisfy their judgment."). But there are no Michigan cases holding that § 500.3006 allows a claimant, not yet possessing a judgment against the insured, to initiate a garnishment proceeding against the insurer.

Nevertheless, the TCC argued that despite the plain language of the Michigan statute which limits its beneficence to personal injury claimants who have obtained unsatisfied executions against the insured tortfeasor, the Court should implement public policy and, in effect, ignore such language. The only authority cited for such a bold suggestion is *American Bank & Trust Co. v. Davis (In re F.O. Baroff Co.)*, 555 F.2d 38 (2d Cir.1977).

*Baroff* addressed the "novel but narrow question" of whether under New York insurance law, the bankruptcy estate of an admittedly liable insured was entitled to retain the insurance proceeds paid to it on the same loss which gave rise to the plaintiff's unsatisfied claim. *Id.* at 39. The insured was a securities broker and the plaintiff was a bank that had guaranteed endorsements forged by the insured's employees. *Id.* at 40. The insured admitted liability for the forgeries

---

15. In the course of the Hartford settlement litigation, the TCC appeared to have asserted that similar statutes in effect in other jurisdictions would also be applicable. As the Debtor is a Michigan corporation and its policies were issued to it in Michigan, it is apparently now conceded that the property interests in these policies must be determined under Michigan law alone. *Cf., Celotex Corp. v. AIU Ins. Co. (In re*

*Celotex Corp.)*, 194 B.R. 668, 28 B.C.D. 1209 (Bankr.M.D.Fla.1996) (Illinois law applicable to insurance policies which were contracted in that state). Although no one cited the Court to such a statutory provision in any one of the insurance policies in dispute, since the insurance policies were issued under Michigan law, the Court will assume that the statutory term is part of each policy.

and the insurer which issued the broker's blanket bond indemnifying the insured for such occurrences had already paid the policy limits to the estate. *Id.* A dispute then arose as to who had superior rights to the insurance proceeds: the plaintiff or the bankruptcy estate. *Id.*

In holding that the plaintiff had superior rights to the proceeds, the court relied on New York Insurance Law § 167(1) (now codified at § 3420(a)(1)), a provision similar to Mich.Comp.Laws § 500.3006; Mich.Stat.Ann. § 24.13006. To explain its reasoning, the court engaged in a long discussion of the policy and legislative history behind the statute. The statute was intended to prevent windfalls to insurers. *Id.* at 41. Before the law's enactment, when an insured who was liable to a third person filed bankruptcy, thereby avoiding its liability to the injured third person, the insurer was able to avoid paying out on the insurance policy on the ground that the insured suffered no loss. *Id.* (citing *Harris v. Standard Accident & Ins. Co.,* 297 F.2d 627 (2d Cir.1961), *cert. denied,* 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962)). As a result, the insurer received a kind of windfall; by the statute, the New York "Legislature sought to remedy this evil." *Id.*

According to *Baroff,* the second and equally important policy behind the enactment of the law was to ensure that "injured claimants be protected against their injurers' bankruptcies." *Id.* at 43. Based on this policy, and despite express language to the contrary, the court concluded that "§ 167(1) ... was not intended to establish any difference in the substantive rights of one who has procured a judgment against his injurer before bankruptcy and one who has not." *Id.*

*Baroff*'s reliance on § 167(1) is somewhat perplexing. Although the policy concerns that led to the enactment of § 167(1) certainly seemed applicable to the issue before the court in a general sense, the facts of the case clearly fell outside of the statute's intended scope. Section 167(1) required that all policies issued in the State of New York insuring against liability for injury to person or property contain:

(a) A provision that the insolvency or bankruptcy of the person insured ... shall not release the insurer from the payment of damages for injury sustained ... during the life of and within the coverage of such policy....

(b) A provision that in case judgment against the insured ... in an action brought to recover damages for injury sustained ... during the life of the policy ... shall remain unsatisfied ... then an action may ... be maintained against the insurer under the terms of the policy ... for the amount of such judgment not exceeding the amount of the applicable limit of coverage under such policy....

N.Y.Ins.Law § 167(1). Thus § 167(1) provides that the insolvency or bankruptcy of the insured will not enable the insurer to avoid its contractual obligations under the policy. And, once she has received an unsatisfied judgment against an insolvent or bankrupt insured, the injured party has the right to sue the insurer.

In *Baroff,* the insurer had fulfilled its contractual obligations by paying the policy limits in full to the insured. There was no judgment against the insured and the insurer was not even a party to the dispute between the plaintiff and the insured. By its plain language, § 167(1) was inapplicable to the facts of the case.

Apparently, *Baroff* is the only court to have afforded § 167(1) such an expansive interpretation. With the exception of *Baroff,* courts applying the New York statute have strictly construed it in accordance with its unambiguous language. *See, e.g., Galecor, Inc. v. Institute of London Underwriters,* 729 F.Supp. 1101 (E.D.Pa.1990); *Tillman v. Fireman's Fund Ins. Co.,* 590 F.Supp. 246 (S.D.N.Y.1984); *Freed v. U.S. Aviation Underwriters, Inc.,* 82 B.R. 9 (S.D.N.Y.1987); *Jackson v. Citizens Cas. Co.,* 277 N.Y. 385, 14 N.E.2d 446 (1938); *Manshul Constr. Corp. v. State Ins. Fund,* 118 A.D.2d 983, 500 N.Y.S.2d 87 (1986); *Abbate v. Medbrod,* 109 A.D.2d 768, 486 N.Y.S.2d 282 (1985); *McNamara v. Allstate Ins. Co.,* 3 A.D.2d 295, 160 N.Y.S.2d 51 (1957); *Lang v. Merchants Mut. Cas. Co.,* 203 Misc. 258, 116 N.Y.S.2d 638 (Sup.Ct.1952).

In fact, the two courts which have been asked to apply the *Baroff* reasoning have emphatically declined to do so. In *Galecor,* the court stated that "[t]he *Baroff* court could afford to twist and bend [§ 167(1)] because the plaintiff's case did not rise or fall on the statute." 729 F.Supp. at 1104. The court further added that "*Baroff* improperly dismisses the[ ] prerequisites from the statute. Section [167(1)] should be given its literal and intended meaning. I will not create exceptions to the clear language of the statute." *Id.* at 1105. In *Freed,* the court concluded that *Baroff*'s interpretation of § 167(1) only applies when "the injured party sues the bankrupt for insurance money paid to the bankrupt on admitted liability" and that *Baroff* does not allow for "a direct action against the insurer when the insured's liability is not established...." 82 B.R. at 12. "New York courts have stated consistently that the direct action provision is in derogation of the common law and, therefore, should be construed strictly." *Id.*

Similarly, this Court does not find the reasoning or holding of *Baroff* persuasive, or even relevant to the case at hand. Aside from the criticism summarized above, the fact is that this case is distinguishable from *Baroff.* These contested matters do not involve a dispute as to whether the tort claimants or the Debtor (or any other party in interest) have superior rights to insurance proceeds already paid to the estate. (That dispute may arise later when the Official Committee of Unsecured Creditors, which represents all such creditors whose claims arise from something other than tort, squares off against the TCC on this very issue.) When the issue arose, the Debtor was not in possession of any of the proceeds from the settlements. Additionally, the Debtor has steadfastly denied liability to any member of the TCC's constituency. Consequently, the Court concludes that the *Baroff* reasoning cannot be relied upon to create for tort claimants property rights in the Debtor's insurance policies.

### 2. Michigan Cases Addressing a Tort Claimant's Interest in Tortfeasor's Insurance Policy

 Though not cited by any of the parties, there is, nonetheless, Michigan case law that arguably gives tort claimants some kind of prejudgment interest in the Debtor's insurance policies. And notwithstanding the TCC's failure to address them, these cases deserve the Court's independent attention.

In *Allstate Ins. Co. v. Hayes,* 442 Mich. 56, 58, 499 N.W.2d 743 (1993), the defendant provided alcohol to a minor who, after becoming intoxicated, was killed in a head-on collision. The decedent's estate brought a wrongful death action against the defendant. Since the defendant, a minor, resided with his father, he tendered defense of the lawsuit to the insurer which issued his father a homeowner's insurance policy. *Id.* The insurer filed a complaint seeking a declaration that the defendant's alleged actions were not covered by the policy, and named the defendant and the decedent's estate as defendants in the action. *Id.* The defendant did not contest the coverage question and the trial court granted declaratory judgment for the insurer. *Id.* at 59–60, 499 N.W.2d 743. The court of appeals affirmed on the ground that the decedent's estate lacked standing to enforce the insurance contract. *Id.* at 60–61, 499 N.W.2d 743.

> The Supreme Court disagreed. It stated that: [O]nce [the insurer] pleaded and proved that an actual controversy existed between itself and [the decedent's estate], the trial court possessed the power to make a declaration regarding the coverage provided by [the insurance] policy. The court's authority to declare the rights of a named interested party was not eliminated by the entry of the default judgment against the insured. Thus, ... the default judgment entered against the insured[,] ... [did not bind the decedent's estate].

*Id.* at 75, 499 N.W.2d 743.

The court favorably cited two court of appeals decisions which have relevance to this discussion. In *Cloud v. Vance,* 97 Mich.App. 446, 296 N.W.2d 68 (1980), the plaintiff sued the insured for damages arising from an automobile accident. When the insured failed to cooperate with the insurer, the insurer obtained by default a declaratory judgment that no coverage was owed under the

insurance policy. 97 Mich.App. at 448, 296 N.W.2d 68. The plaintiff was not given notice of the declaratory judgment action and was not a party to the proceeding. *Id.* Thereafter, the plaintiff obtained a default judgment against the insured and sought collection from the insurer by writ of garnishment. *Id.* at 448–49, 296 N.W.2d 68. The insurer relied on the prior declaratory judgment, arguing that it barred the plaintiff from asserting that the insurer was liable. *Id.* at 449, 296 N.W.2d 68.

The court disagreed, stating that, based upon Mich.Comp.Laws § 500.3006; Mich. Stat.Ann. § 24.31006, the "plaintiff had an independent interest [16] in the insurance policy from the time of the accident, *contingent upon his recovery against the [insured]*." *Id.* at 451–52, 296 N.W.2d 68 (emphasis added). As such, the court held that the plaintiff was a proper party to the insurer's declaratory judgment action and was entitled to notice and an opportunity to intervene. *Id.* Without these procedural protections, the declaration was not binding on the plaintiff. *Id.*

In the second case, *Security Ins. Co. v. Daniels,* 70 Mich.App. 100, 245 N.W.2d 418 (1976), the insurer also obtained a declaratory judgment that the insurance policy did not provide coverage for injuries that occurred during an automobile accident. As in *Hayes,* the injured party was named as a defendant in the declaratory action by the insurer. 70 Mich.App. at 104, 245 N.W.2d 418. When the injured party appealed the coverage ruling, the insurer asserted that the injured party did not have standing to pursue the appeal. *Id.* The court held that the injured party possessed an interest in the coverage issue stemming from the fact that if he were to succeed in the underlying tort action, he would have a right to proceed against the insurer by writ of garnishment. *Id.* at 105,

245 N.W.2d 418. The court further noted that the insurer "could have accepted the protection of Mich.Comp.Laws § 500.3030, Mich.Stat.Ann. § 24.13030 [which prevents the injured party from joining the insurer in the underlying tort action],[17] and postponed litigation of the coverage issue." *Id.* However, since the insurer raised the issue and the injured party, as a named defendant, had an interest in the issue's resolution, the injured party had standing to appeal. *Id.*

All of these cases follow the reasoning of *Flanagan v. Harder,* 270 Mich. 288, 258 N.W. 633 (1935), which in turn followed *Iden v. Huber,* 259 Mich. 3, 242 N.W. 818 (1932). In *Flanagan,* the plaintiff obtained judgment against the insured for injuries suffered in an automobile accident. 270 Mich. at 289, 258 N.W. 633. However, the day before judgment was rendered, the insured released the insurer from the insurance contract without receiving any consideration in return. *Id.* at 289–90, 258 N.W. 633. The court held that the release of the insurer was fraudulent and that the plaintiff was entitled to have it set aside. *Id.* at 290–92, 258 N.W. 633.

In *Iden,* the plaintiff was injured in an accident by an automobile owned by the insured. 259 Mich. at 4, 242 N.W. 818. As in *Flanagan,* the insured released the insurer from liability under the insurance policy for little or no consideration before the plaintiff obtained judgment against the insured. *Id.* at 5, 242 N.W. 818. Claiming that the release was fraudulent, the plaintiff brought suit to have it set aside. *Id.* The insurer defended on the ground that "the plaintiff can have no greater rights than [the insured] had, and inasmuch as [the insured] settled with the [insurer] and released it from liability, the plaintiff cannot recover." *Id.* In an

---

**16.** In another case, a court described "the rights of the injured parties" as "superior and greater than the insured, against the insurer." *New Amsterdam Cas. Co. v. Jones,* 135 F.2d 191, 194 (6th Cir.1943). The fact that some courts have used the terms "independent" and "superior" to describe the nature of the plaintiff's interest is important and will be discussed in greater detail later. *See* pp. 240–42 *infra.*

**17.** This section states:

In the original action brought by the injured person, or his or her personal representative in case death results from the accident, as mentioned in section 3006, the insurer shall not be made or joined as a party defendant, nor, except as otherwise provided by law, shall any reference whatever be made to such insurer or to the question of carrying such insurance during the course of trial.

Mich.Comp.Laws § 500.3030; Mich.Stat.Ann. § 24.13030.

egregious run-on sentence, the court rejected this argument reasoning that:

> If the [insured] was a party to a fraudulent settlement, made for inadequate consideration, with the insurance company, by which it was sought to beat plaintiff out of her ability to realize upon the judgment which she recovered, [the insured] might not, on account of her fraud, be able to maintain a suit to set aside this release and transfer of a chose in action fraudulently conveyed away to beat plaintiff, on the general theory the law leaves parties to a fraudulent transaction where it finds them, and will not lend its aid to assist them out of a position in which they have fraudulently placed themselves; but this is the reason plaintiff may recover, upon the theory [the insured] fraudulently transferred this chose in action by releasing the insurance company from liability.

*Id.* Therefore, the court held that the plaintiff was "entitled to have the conveyance set aside or obligation annulled to the extent necessary to satisfy her claim." *Id.* at 6, 242 N.W. 818.

These Michigan cases recognize that an injured party has an interest of some type in the alleged tortfeasor's insurance policy and that the interest comes into being prior to the injured plaintiff obtaining judgment. However, they fail to identify the source or the nature of that interest. To determine whether such an interest rises to the level of a constitutionally-protected property right, as the TCC claimed, requires further examination.

### 3. *Third–Party Beneficiary Law*

 It is clear that this interest does not arise from Michigan's law on contracts. An insurance policy is a contract between two parties: the insurer and the insured. *See Harrow Prods., Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1025 (6th Cir.1995); *Arco Indus. Corp. v. American Motorists Ins. Co.,* 448 Mich. 395, 403, 531 N.W.2d 168 (1995). As a general rule, Michigan law provides that a nonparty to a contract can only sue under the contract if such person is a third-party beneficiary. *See Allstate Ins. Co. v. Keillor,* 190 Mich.App. 499, 501, 476 N.W.2d 453

(1991), *rev'd on other grounds sub nom Allstate Ins. Co. v. Hayes,* 442 Mich. 56, 499 N.W.2d 743 (1993); . Mich.Comp.Laws § 600.1405; Mich.Stat.Ann. § 27A.1405. Under Michigan law, an injured party is not a third-party beneficiary to an insured's general liability policy. *See Keillor,* 190 Mich.App. at 502, 476 N.W.2d 453; *Schafer Oil Co. v. Universal Underwriters Ins. Co.,* 820 F.Supp. 321, 324 (E.D.Mich.1993). For this reason, apparently, the TCC did "not rely on this theory but rather on MCLA § 500.3006." Memorandum of TCC, p. 9. Consequently, whatever interest the tort claimants possess, it is not contractually based. *See generally,* 46A C.J.S. Insurance § 1407 (West 1995) ("As a general rule, in the absence of policy or statutory provisions to the contrary, one who suffers injury is not in privity of contract with the insurance company under a liability insurance policy and cannot reach the proceeds of the policy for the payment of his claim by an action directly against the insurance company.").

### 4. *The Garnishment Statute*

*Hayes, Cloud* and *Daniels* each suggested that a claimant's interest "stems from the availability of a post-judgment garnishment action against the insurer [under Mich.Comp. Laws § 500.3006] in which the coverage question would be litigated." *Hayes,* 442 Mich. at 69 n. 13, 499 N.W.2d 743; *Cloud,* 97 Mich.App. at 449–50, 296 N.W.2d 68; *Daniels,* 70 Mich.App. at 105, 245 N.W.2d 418. However, by its plain language, application of the statute is predicated upon the injured plaintiff first obtaining a judgment against the insured. Thus, Mich.Comp.Laws § 500.3006 does not *per se* create any pre-judgment rights or interests in the injured plaintiff.

### 5. *Derivative Nature of a Tort Claimant's Rights Against an Insurer*

The right to sue an insurance company under Mich.Comp.Laws § 500.3006 is expressly called a "garnishment" by the statute. By its very nature, a garnishment is a derivative action: the plaintiff receives payment of the garnisheed party's obligation owed to the principal defendant. If there is

no such liability when the writ of garnishment issues, then the plaintiff receives nothing. *See In re Dow Corning Corp.*, 192 B.R. 428, 439, 28 B.C.D. 727 (Bankr.E.D.Mich. 1996) (citing Michigan cases). Although not based on Michigan law, at least one other case concluded similarly. In *In re Forty–Eight Insulations, Inc.*, 133 B.R. 973, 22 B.C.D. 497, 25 C.B.C.2d 1629 (Bankr.N.D.Ill. 1991), *aff'd* 149 B.R. 860 (N.D.Ill.1992), Judge Barliant stated that "tort claimants have no legal or equitable interest in the insurance policy in the first place, any more than they do in other property of the estate, so that their property rights are not impaired by a settlement of the debtor's claim to coverage." His back-up position was that at most "a tort claimant's rights against the insurer [of the tortfeasor are] ... 'derivative.'"

In the context of this statute, however, there exist statements in some cases which tend to make an exception to the derivative title doctrine. These cases seem to say that since insurance law is infused "with a public interest," injured third parties "under many circumstances, have rights, superior and greater than the insured, against the insurer." *New Amsterdam Cas. Co. v. Jones*, 135 F.2d 191, 196 (6th Cir.1943). And although at least one court has described the injured person's interest as "independent" of those of the insured tortfeasor, *Cloud*, 97 Mich.App. at 451, 296 N.W.2d 68, the use of that term is misleadingly imprecise.

"The injured person in exercising his statutory right to proceed directly against the insurance company, has the rights possessed by the insured, and as a general rule he has no greater rights...." 46A C.J.S. Insurance § 1412.[18]

Both opinions in *New Amsterdam Cas. Co. v. Jones*, relied upon by the TCC, contain many broad statements about the relationship between the injured person, the insured tortfeasor and the tortfeasor's insurance company. And the result seems to very strongly support the TCC's position.

Jones owned a gas station and had purchased an "accident" policy from the plaintiff. Martin was a customer who, after an argument with Jones, was shot by him. Jones was convicted of assault and imprisoned. Later, Martin received a money judgment against Jones for the injuries he sustained. Martin (presumably unsuccessfully levied on Jones' property and then) garnisheed the plaintiff. The plaintiff initiated a suit for a declaration that it owed nothing on the ground that Jones' act was intentional and malicious and was not, therefore, an "accident" covered by its policy. The district court's judgment for Martin was affirmed. The courts relied on Michigan law which provided that whether an incident is or is not an accident is judged from the viewpoint of the victim, and that if the injured person did not provoke the injurious response, even an assault is—from his standpoint—an accident.[19] Accordingly, the policy was in force.

Citing the forerunner of Mich.Comp.Laws § 500.3006, the court set forth the general rule, which is that when a writ of garnishment issues against a liability insurer on a judgment returned unsatisfied against the insured, "the insurer 'shall have all the defenses ... that it originally had against its assured under the terms of the policy.'" 135

---

**18.** The exception to the general rule is in the case of compulsory insurance such as automobile insurance. 46A C.J.S. Insurance § 1412. *Wells v. Piggott (In re Fay Stocking Co.)*, 95 F.2d 961 (6th Cir.1938), cited by the TCC, is simply an example of the exception for automobile insurance policies. In that case, the policy expressly provided that the insurer was "to pay and satisfy judgments rendered against the Assured...." *Id.* at 963. Not surprisingly, the court held that the person injured by, and who had obtained a judgment against, the insured, was a "beneficiary" of the policy. *Id.*

Moreover, in Michigan, "[w]here insurance is compulsory ... the injured person is generally regarded as a third-party beneficiary...."

*Williams v. Grossman*, 409 Mich. 67, 85 n. 22, 293 N.W.2d 315 (1980). And in Michigan, automobile insurance is compulsory. Mich.Comp. Laws § 500.3101(1); Mich.Stat.Ann. 24.13101(1). General liability insurance and product liability insurance, which are the subjects of the current settlements, are not compulsory. Thus, this narrow exception does not apply here.

**19.** This is no longer the rule of law in Michigan. *See Arco Indus. Corp. v. American Motorists Ins. Co.*, 448 Mich. 395, 405, 531 N.W.2d 168 (1995) ("[A]ccidents are evaluated from the standpoint of the insured, not the injured person.").

F.2d at 195. It then explained that "[s]uch defenses would conceivably relate to the specified exclusions ...—terms upon which the contract was executed. None of these are here submitted as defenses." *Id. See also New Amsterdam Cas. Co. v. Jones*, 45 F.Supp. at 890 ("If the insurance company did not want to insure Jones against this kind of an accident to others—and we specifically direct attention to the exact wording of this policy that it insured Jones against 'accident ... by any person or persons not employed by the Assured'—it should have written into its policy a clause that it would not be responsible for the result of any willful or intentional wrongful act of the insured. Such policies have been written and the courts have upheld them.... Not having that provision in its policy I believe that plaintiff here can be held as garnishee defendant and so hold.") (citations omitted).

Had the insurance policy specifically excluded "accident" caused by the intentional acts of the insured, the injured person— stepping into the shoes of the insured— would have been bound by that clause. Despite the loose language in the opinions, then, the case is four-square with the general rule of garnishments: such an action is derivative in nature. *See also Forty–Eight Insulations, supra.*

### 6. *Fraudulent Conveyance Law—Meaning of "Independent" or "Superior"*

But what about statements, such as in *Cloud*, that the injured person's rights are "independent" from the insured's? To a certain extent, they are independent. But they are not independent in a way which interferes with the Debtor's right to conclude these settlements.

Prior to obtaining judgment, an injured party, like any other plaintiff, generally has no more than an expectation that he/she will be able to collect from the defendant-insured's property, including its insurance policy chose-in-action. The injured party's claim against the insured is a vested property interest entitled to constitutional protection. *Grubaugh v. City of St. Johns*, 384 Mich. 165, 170, 180 N.W.2d 778 (1970) ("[T]he constitutional provision of due process extends to protect that property construed to be a vested right and that generally an accrued right of action is a vested property right which may not be arbitrarily impinged."). It does not follow, however, that having an accrued cause of action simultaneously creates a vested property right in any of the tortfeasor's property. The very purpose for an injured party seeking judgment against the defendant is to obtain a judicial determination of the defendant's liability. Only upon such a ruling will the injured person then be allowed to look to the defendant's property to satisfy the judgment. In short, prior to obtaining and enforcing a judgment, an injured person merely has an expectation of recovery that is contingent upon the occurrence of future events, and such expectation does not rise to the level of a vested property right.

Nonetheless, the Michigan cases discussed above allowed the injured party, possessing a mere expectation, to step into the shoes of the insured and contest the insurer on the coverage issue. The answer to this apparent inconsistency is found in the common theme running through *Hayes, Cloud, Daniels, Flanagan* and *Iden:* prevention of fraud against the injured party.

In these cases the insured appears to have been effectively insolvent. *See, e.g., Hayes*, 442 Mich. at 58, 499 N.W.2d 743 (The insured was a twenty-year-old about to enter the United States Air Force at the time of the accident. The clear implication was that the insured was devoid of assets from which the plaintiff could recover in the event of judgment against him.); *Flanagan*, 270 Mich. at 291, 258 N.W. 633 ("The proofs show the insolvency of [the insured]...."); *Iden*, 259 Mich. at 6, 242 N.W. 818 ("[Insureds] were apparently insolvent."). So in the event of judgment against the insured, the injured party's only real hope of being compensated for his injuries hinged on his ability to recover from the insurer. Yet the insured had let the insurers off the hook while receiving little or no consideration in return. "Every conveyance made ... by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made ... without a fair consideration." Mich.Comp.Laws

§ 566.14; Mich.Stat.Ann. § 26.884. Conveyance "includes every ... release ... of tangible or intangible property...." Mich.Comp. Laws § 566.11; Mich.Stat.Ann. § 26.881.

In both *Flanagan* and *Iden,* the insureds fraudulently released the insurers from any liability to the injured parties prior to judgment. In *Hayes* and *Cloud* the insureds did not contest the coverage issue and the insurer obtained a declaration of no coverage by default. Thus, the insureds chose not to assert their contractual rights under the insurance policies to the detriment of the injured parties. The situation in *Daniels* was only one step removed from this scenario. There the insured fought the coverage issue at the trial court level, but when judgment was rendered for the insurer, the insured did not appeal.

Had these courts not granted the injured parties standing to derivatively assert the insureds' contractual rights under the insurance policies, they would have become instrumentalities of fraud. Such a result could not be, and is not, countenanced by the courts. These common sense holdings are actually just applications of fraudulent conveyance law. *Flanagan* and *Iden* explicitly recognized this fact. *Flanagan,* 270 Mich. at 291– 92, 258 N.W. 633; *Iden,* 259 Mich. at 6, 242 N.W. 818. And despite some of the broad rhetoric, the reasoning in *Hayes, Cloud* and *Daniels* is no different. Therefore, as with any other defrauded creditor, when the insureds released property for little or no consideration, the injured parties were entitled to have those releases set aside. Since a creditor of a transferor—but not the transferor himself—has a right to avoid a fraudulent transfer, the creditor's right can be said to be "independent" of the transferor's and "superior." But that does not mean that the unsecured creditor has a property interest in the transferred property.

The fraudulent transfer situation can arise in a familiar insurance context. When there are multiple claims against an insured for more than the limits of the defendant's insurance coverage, the insurer can settle with some of the plaintiffs and not others even though the result is to leave the others without remedy. *See generally,* 46A C.J.S. Insurance § 1409d. And so long as the settlements are in good faith and are otherwise reasonable, they are not subject to attack by the unsatisfied plaintiffs. If, however, a settlement is in bad faith, giving too much to one claimant, leaving insufficient coverage for other claimants, it is subject to attack when the claimant has reduced his/her claim to judgment against the tortfeasor. If the tortfeasor does not or cannot pay the judgment out of its own treasury, the judgment plaintiff can seek to show that the disposition of the insurance coverage was fraudulent either because it was done with the intent to freeze out the judgment plaintiff (the *Iden* and *Flanagan* situations) or because the settlement amount was in return for a less than fair consideration (the others).[20]

In this case, however, these were precisely the issues which were litigated in these contested matters. The Debtor has vigorously asserted its right to insurance coverage through extremely competent—and expensive—counsel. Because this Court found that the settlements were reasonable and in good faith, the tort claimants have had their

---

**20.** In Louisiana, allegedly injured persons have the right to sue the insurer of his/her alleged tortfeasor directly without even naming the alleged tortfeasor as a party. L.S.A.–R.S. 22:655; *Webb v. Zurich Ins. Co.,* 251 La. 558, 205 So.2d 398 (1967). A group of claimants are plaintiffs in a class action pending in state court in Louisiana on behalf of all Louisiana claimants against Dow Corning and others. *Marilyn Spitzfaden, et al. v. Dow Corning Corp. et al.,* Docket No. 92– 2589 Civil District Court for Parish Orleans Division F. The TCC therefore argued that this group of plaintiffs has rights against the insurers directly which cannot be abridged in the manner provided here.

But Louisiana, as do most states, permits an insurer to settle with one or more allegedly injured persons to the detriment of others so long as the settlements are reasonable and are made in good faith. *Holtzclaw v. Falco, Inc.,* 355 So.2d 1279 (La.1978); *Richard v. Southern Farm Bureau Cas. Ins. Co.,* 254 La. 429, 223 So.2d 858 (1969). The TCC argued that if injured parties had no rights, they would not be protected by these caveats. But the Louisiana jurisprudence is no different, nor broader, than Michigan's in its concern that a party not dispose of an asset unreasonably and in bad faith.

day in court on these issues and ought to be enjoined from trying to litigate them again.

As a general rule then, Michigan cases cannot be read to mean that prior to obtaining judgment, a tort claimant has more than an expectation in the insured defendant's property. To interpret these cases in that manner would make little sense for it would run contrary to basic notions of property ownership. Unquestionably, there are important public policy considerations mandating the protection of an injured party's ability to recover in the event of judgment. However, this expectation is adequately protected by fraudulent conveyance law. The fact that fraudulent or constructively fraudulent[21] behavior by the insured was involved in all of the Michigan cases granting the injured party standing to challenge the coverage issue only supports this conclusion.

### 7. *Policy Favoring Settlements*

A contrary interpretation would be problematic for another reason. Michigan has an equally compelling public policy of favoring settlements. It is well established that "[s]ettlements of disputed matters ... are favored by the law...." *Booth Fisheries Co. v. Alpena Circuit Judge*, 170 Mich. 611, 615, 135 N.W. 1063 (1912); *Domako v. Rowe*, 438 Mich. 347, 361, 475 N.W.2d 30 (1991). To grant an injured party more than an expectation before receipt of judgment would inhibit legitimate settlements. An insurer would never be able to settle a coverage suit with its insured without impleading the known injured party. It is axiomatic that the more parties involved, the more difficult it is to settle. Even more troubling is the situation, which exists here, where at the time of the proposed settlement there are injured party claimants who are not yet known. If each unknown claimant could later sue the insurer and not be estopped by a fully litigated judgment against its insured or by a fair and equitable settlement, there would be no finality to litigation and no realistic likelihood of settlement. Therefore, it is not surprising that there appears to be no

case where a fair and reasonable settlement entered into in good faith between an insurer and insured was subsequently undone by a court.

For this reason courts will permit an insured to sue its insurer free from interference from the allegedly injured parties whenever it appears to the court's satisfaction that the insured is adequately representing their common interests. That was exactly what Judge Colombo did when two groups of tort claimants attempted to intervene in the insurance coverage litigation between the Debtor and its various insurers that was pending in Wayne County Circuit Court. One group of claimants which attempted to intervene was the Plaintiffs' Steering Committee for *In re: Silicone Gel Breast Implant Product Liability Litigation* MDL 926 (N.D.Ala.). This group represents the interests of over 440,000 women who filed claims in the MDL. The second group consisted of certain Australian tort claimants. Judge Colombo denied both motions because the interests of the intervening plaintiffs were adequately represented by the Debtor.

■ It is apparent that prior to obtaining judgment against the Debtor, Michigan law grants tort claimants some type of interest in the Debtor's insurance policies. Based upon the above analysis, the Court concludes that such interest has two aspects: one which is derivative of the rights of the Debtor in its insurance policies and another which is independent and superior to the Debtor's rights. But enforcement of both the derivative aspect and the independent aspect are foreclosed by this Court's determination—after substantial litigation—that the settlement of the Debtor's rights in the policies were fair and equitable and made in good faith. Moreover, the interest amounts to no more than a mere expectation and does not rise to the level of a constitutionally-protected property right. Nonetheless, even if the tort claimants had a constitutionally-protected interest, the Court

---

21. *Flanagan* and *Iden* apparently involved intentional fraud. The others are more accurately described as common-sense applications of constructive fraud remedies. Mich.Comp.Laws § 566.14; Mich.Stat.Ann. § 26.884; *see generally*, 12 *Michigan Law and Practice* Fraudulent Conveyances § 21 (West 1995).

concludes that the process they received was appropriate. *See* pp. 248–51 *infra.*

## C. *Power of the Court to Enjoin Lawsuits Against Settling Insurers* [22]

A bankruptcy court has the authority to approve a proposed settlement pursuant to F.R.Bankr.P. 9019, if the court finds the settlement to be fair and equitable. The TCC, however, asserted that the Court does not have authority to approve the current settlements because they "finally and forever compromise[ ], settle[ ], release[ ] and discharge[ ] the ... insurers" from any claims that the tort claimants may have against them. *E.g.,* Order Authorizing and Approving Compromise and Settlement with TIG Insurance Company and Other Insurers, ¶ 5.

### 1. *Section 524(e) Not Implicated*

■ According to the TCC, such a release violates § 524(e) of the Bankruptcy Code which states, with an exception not relevant to this matter, that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The TCC failed to supplement the objection with any other authority other than the bare statutory cite. Nonetheless, there are numerous cases holding that pursuant to § 524(e), a discharge in bankruptcy of the debtor-insured does not prevent an injured party from naming a discharged debtor in a post-discharge lawsuit solely to get at the insurance coverage. *Houston v. Edgeworth*

*(In re Edgeworth),* 993 F.2d 51, 54 (5th Cir. 1993); *Hendrix v. Page (In re Hendrix),* 986 F.2d 195, 197 (7th Cir.1993),; *Green v. Welsh,* 956 F.2d 30, 33 (2nd Cir.1992); *Owaski v. Jet Florida Systems, Inc. (In re Jet Florida Systems, Inc.),* 883 F.2d 970, 976 (11th Cir.1989). Similarly, stays are routinely lifted during the course of the case to allow such actions to proceed. *See e.g. International Business Machines v. Fernstrom Storage and Van Co. (In re Fernstrom Storage and Van Co.),* 938 F.2d 731 (7th Cir. 1991).

On the other hand, mass tort cases have provided for injunctions barring injured parties with claims against the debtors' estates from pursuing the debtors' insurers after the insurers paid money into the estates as part of settlements. *See Menard–Sanford v. Mabey (In re A.H. Robins Co., Inc.),* 880 F.2d 694 (4th Cir.1989), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 837 F.2d 89 (2nd Cir. 1988), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *UNARCO Bloomington Factory Workers v. UNR Indus., Inc.,* 124 B.R. 268 (N.D.Ill.1990). In each of these mass tort cases, the injunctive orders were entered as part of plan confirmation. Since the effect of confirming a chapter 11 plan is to "discharge[ ] the debtor from any debt that arose before the date of [plan] confirmation...." 11 U.S.C. § 1141(d)(1)(A), it is not surprising that these cases addressed the effect of § 524(e)

---

**22.** Technically, no injunction was issued. Instead, the orders approving the settlements each contained a paragraph which read that the settling insurer:

and its respective employees, officials, agents, attorneys, representatives, officers and directors shall be and hereby are fully, finally and forever released and discharged from and against any and all claims, causes of action, rights, suits, debts, controversies, judgments, damages, demands, charges, encumbrances, liabilities and obligations of any nature whatsoever, known or unknown, including without limitation, claims for bad faith, consequential damages, punitive damages, exemplary damages, prejudgment interest and attorneys' fees, if any arising out of, based on or in any way related to the Released Subject Matter, that could be asserted now or at any time in the future by any Person....

The TCC argued that this provision in effect provided the settling insurers with a "discharge" in violation of 11 U.S.C. § 524(e). The Debtor argued that a "release" is not a "discharge." It also asserted that releases are not injunctions; tort claimants could always sue an insurer but the insurer would have an affirmative defense of release.

These distinctions are not persuasive. Under any construct the result will be that the tort claimants lose their rights, if any, to pursue a settling insurer. The issue is whether the Court has the power to effect that result. Quibbling over the terminology is unproductive. The fact that these releases interfere with a tort claimant's effort to vindicate her rights, if any, gives her a right to complain. *Cf. Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746 (5th Cir.1995).

244

on the court's power to enter the injunction.[23] But a bankruptcy court's power to enjoin tort claimants from proceeding against settling insurers is not proscribed by § 524(e).

The Code specifically states that the "discharge of a debt of the debtor does not affect the liability of any other entity [for] ... such debt." 11 U.S.C. § 524(e). By its language then, § 524(e) is only implicated when the debtor is receiving a discharge. But in this case, the Debtor is not currently receiving a discharge. As of yet a proposed plan of reorganization has not even been filed. If the release preventing tort claimants from successfully suing the insurers can be characterized as a "discharge" of the insurers' obligations (if any) to the tort claimants, such discharge obviously does not arise from nor is it in any way related to the Debtor's discharge. Consequently, the releases do not implicate § 524(e). Even if the releases were ordered in connection with a reorganization plan, the reasoning and outcome would be the same. At confirmation, a court ordered injunction prohibiting tort claimant lawsuits against insurers is not born out of the debtor's discharge.

## 2. Applicability of § 363(f)

However, the conclusion that § 524(e) is not applicable does not resolve the TCC's objection. For in its basic form, the TCC's argument is simply that this Court lacks the power to cut off the tort claimants' rights against the insurers. But such power has been held to be within a court's power to approve a compromise. See In re Energy Cooperative, Inc., 886 F.2d 921 (7th Cir. 1989). And, in any event, the power is implicit within two different sorts of equitable proceedings: the power to approve a sale "free and clear of any interest in such property of any entity other than the estate," 11 U.S.C. § 363(f), and the power to discharge a stakeholder in an interpleader action.

Under § 363(f), a "trustee [or debtor-in-possession] may sell property ... free and clear of any interest in such property of any entity other than the estate" if any of the following conditions is satisfied:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

There is no dispute that a debtor's interest in its insurance policies is property of the estate. Homsy v. Floyd (In re Vitek, Inc.), 51 F.3d 530, 535 (5th Cir.1995); MacArthur, 837 F.2d at 92. Furthermore, estate property can be sold "free and clear of any interest in such property." (emphasis added). Thus, it is clear that "§ 363 covers more situations than just sales involving liens." P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia (In re P.K.R. Convalescent Centers, Inc.), 189 B.R. 90, 94 (Bankr.E.D.Va.1995). Numerous courts have held that estate property can be sold free and clear of existing claims which are derivative of the debtor's rights in that property. Michigan Employment Security Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1149–50 (6th Cir.1991) (affirming provision of injunction prohibiting state agency from collecting debtor's unpaid unemployment taxes by increasing the rate charged to company which acquired debtor's assets in a bankruptcy sale); MacArthur, 837 F.2d at 94; Forde v. Kee–Lox Mfg. Co., 437 F.Supp. 631, 634–35 (W.D.N.Y.1977), aff'd on other grounds 584 F.2d 4 (2d Cir.1978) (debtor's estate sold asset free and clear of creditor's civil rights claim); WBQ Partnership v. Commonwealth of Virginia (In re WBQ

---

**23.** MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.), 837 F.2d 89 (2nd Cir. 1988), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) did not actually mention § 524(e), though given the court's reasoning, it is clear that the statute's applicability was considered and rejected. The plaintiff argued that the bankruptcy court "lacked ... authority to enjoin the suits against [the debtor's] insurers ... [because] the injunctive orders constitute[d] a de facto discharge in bankruptcy of nondebtor parties...." Id. at 91.

*Partnership)*, 189 B.R. 97, 105, 27 B.C.D. 1200, 34 C.B.C.2d 674 (Bankr.E.D.Va.1995) (Virginia's right to recover depreciation overpayment upon sale of debtor's asset was an "interest" within meaning of § 363(f)); *PKR Convalescent Centers*, 189 B.R. at 94; *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948–49, 16 B.C.D. 217, 17 C.B.C.2d 293 (Bankr.N.D.Ohio 1987) (debtor's assets sold free and clear of existing tort claims); *American Living Systems v. Bonapfel (In re All American of Ashburn, Inc.)*, 56 B.R. 186, 189–91, 14 C.B.C.2d 303 (Bankr.N.D.Ga.), *aff'd sub nom. Griffin v. Bonapfel (In re All American of Ashburn, Inc.)*, 805 F.2d 1515 (11th Cir.1986) (assets used to manufacture allegedly defective products sold free and clear of existing claims); *Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.)*, 19 B.R. 323, 329, 8 B.C.D. 1382, 6 C.B.C.2d 549 (Bankr. W.D.Wash.1982) (debtor's business sold free and clear of Title VII employment discrimination and civil rights claims possessed by the debtor's employees).

Additionally, at least two of § 363(f)'s enumerated conditions are satisfied. Given all that was discussed so far, coupled with the fact that the Debtor vehemently denies liability to the tort claimants, it is easy to conclude that the interest, if any, of a tort claimant in any of the Debtor's insurance policies "is in bona fide dispute." And because absent collusion, "nonbankruptcy law permits 'sale'" (i.e., a negotiated settlement) of an insured's cause of action against its insurer free and clear of any interest of an injured party whose tort claim would trigger the insurer's duty to defend and indemnify the insured, § 363(f)(1) is also applicable.

Courts have long recognized that inherent within the authority to sell estate property free and clear of liens is the power to enjoin creditors from pursuing the purchaser of such property. *See Whitehead & Kales Co. v. Dempster (In re Wiltse Bros. Corp.)*, 361 F.2d 295, 299 (6th Cir.1966).[24] Nevertheless,

more explicit protection is often needed to effectuate this important aspect of a § 363 sale. In other words, an actual injunction barring creditors from suing a purchaser of estate assets is sometimes necessary and appropriate to give the "free and clear" aspect of § 363(f) meaning. When this is the case, a court has the power to "issue an[ ] order ... necessary or appropriate to carry out [§ 363(f), one of] the provisions of the [Bankruptcy Code]." 11 U.S.C. § 105(a). *See, e.g., WBQ Partnership*, 189 B.R. at 110; *cf. MacArthur*, 837 F.2d at 93–94; *PKR Convalescent Centers*, 189 B.R. at 96. Accordingly, the Court has the power to order releases of the tort claimants' alleged interests, i.e.: in effect, to order sale free and clear of their interests.

That the matter was presented as a compromise of controversy, which it is, does not obviate the applicability of § 363(f). Equating compromises/settlements of lawsuits to sales of a debtor's property is appropriate because there is so little to distinguish them. A sale has been defined as "[a] contract between two parties ... by which the [seller], in consideration of the payment or promise of payment of a certain price in money, transfers to [the buyer] the title and possession of property." *Black's Law Dictionary* 1337 (6th ed. 1990). Or, it is simply defined as the "[p]assing of title from seller to buyer for a price." *Id.* Conversely, a compromise/settlement has been defined as "[a]n agreement or arrangement by which, in consideration of mutual concessions, a controversy is terminated." *Id.* at 287. Both situations require negotiation and an eventual meeting of the minds whereby each party agrees to give something in order to get something. Thus, when a compromise/settlement involves the exchange of property, the line between it and a sale begins to blur. *See In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 n. 7, 26 B.C.D. 511 (Bankr. N.D.Ill.1994) ("The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim. There is no

---

**24.** Therefore, the TCC's unsupported assertion that "[w]hen a *res* is transferred free and clear under bankruptcy law ... releases are not imposed on third parties of claims they have against other nondebtor third parties," Memorandum of TCC at 16, is plainly wrong when the claims being released are held by creditors of the estate, are primarily derivative of the claims of the debtor and the nondebtor party being released is the purchaser of the *res*.

difference in the effect on the estate between the sale of a claim (by way of assignment) to a third party and a settlement of the claim with an adverse party."); Lee R. Bogandoff, *The Purchase and Sale of Assets in Reorganization Cases—of Interest and Principal, of Principles and Interests,* 47 Bus.Law 1367, 1393 (1992) ("In the vast majority of circumstances, a proposed transaction legitimately may be characterized as a combined 'use, sale or lease' of property and compromise of controversy....").

Because there are different rules of procedure for sales (F.R.Bankr.P. 6004) and compromises (F.R.Bankr.P. 9019), people have tended to think that they are somehow different. But Rule 9019, being merely a rule, can do no more than establish a procedural mechanism for exercising a statutory power. The Rules cannot "abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075. And the Bankruptcy Code is silent on the topic of compromises. So unless the Code allows the trustee to enter into settlements, the rule describing the procedure for achieving it is useless.

Rule 9019 derives from former Rule 919. *See* 9 *Collier on Bankruptcy,* ¶ 9019.02 (15th ed. 1996). Former Rule 919 cross-referenced § 27 of the Bankruptcy Act, 11 U.S.C. § 50 (repealed), which provided that "[t]he receiver or trustee may, with approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate." When the Bankruptcy Code was enacted in 1978, a corresponding Code section to old § 27 was not created. And legislative history does not state whether or not the drafters of the Code intended former § 27 to be subsumed within another Code section. However, they must have.

Under the Act, Congress specifically provided trustees with the power to effect settlements and compromises, and made the statutory power separate from the trustee's power to sell estate property, which was found in § 70f, 11 U.S.C. § 110 (repealed). It is not logical to assume that Congress intended to deprive trustees of the power to settle lawsuits and to compromise disputes even though those words no longer expressly appear in the statute. After all, the Code does provide that the trustee has the "capacity to sue and be sued." 11 U.S.C. § 323(b). This cannot mean that he can sue but not settle. The Code requires the trustee to "collect and reduce to money the property of the estate...." 11 U.S.C. § 704(1). When the property of the estate consists of choses in action, settlement is the most efficient manner of expeditiously liquidating the estate.

> Choses in action are intangible property rights which may or may not be disputed. Such rights would include the right to collect accounts receivable, [and] unliquidated claims for damages....
>
> [T]here is substantial incentive on the part of the trustee to settle outstanding litigation. The trustee should make every effort, alone or with the trustee's attorney, to secure a prompt and equitable settlement for the benefit of the estate. The old saw that a bad settlement is better than a good lawsuit has no truer application than in a bankruptcy case. Bankruptcy courts historically have encouraged trustees to settle lawsuits to the end that the administration of the estate may be wound up promptly. When a dispute is settled, such settlement will involve a compromise.

1995 *Collier Handbook for Trustees and Debtors in Possession,* ¶ 11.03 ("Liquidation of Choses in Action") (Matthew Bender 1995). The most logical assumption is that the express power to enter settlements and compromises is now simply part of the trustee's statutory power of sale of assets. Congress must have understood that in economic terms a sale of a chose in action to an outsider is no different than a sale of the same chose in action to the putative or actual defendant. It is just another manner of alienating a property interest owned by the estate.

Section 70f directed that "[r]eal and personal property ... be sold." But the section conditioned sale upon an appraisal performed by a court approved appraiser. ("The ... appraiser ... shall appraise all the items of real and personal property belonging to the bankrupt estate ...") It is apparent from this provision that "personal property" in § 70f referred to tangible personalty only.

There was therefore a need for a separate section giving the trustee authority to liquidate intangibles: thus § 27.

 The section dealing with sales in the Code, § 363, is not restricted to tangible personalty. In fact, in § 363(a) it is made plain that many forms of intangible personalty are included within the trustee's power to use, sell, or lease property of the estate. And the specific term used for property which the trustee may sell is the extremely broad "property of the estate." 11 U.S.C. §§ 363(b), 541(a). This formulation is certainly broad enough to include a trustee's alienation of a chose in action through compromise/settlement.

Therefore, the Court has the power to enter orders enjoining lawsuits against the insurers in order to clarify the effect of its decision to approve the compromises ("sales") of the Debtor's choses in action against the insurers.

### 3. Interpleader

The same result obtains when analyzed using a somewhat different approach: interpleader. Notwithstanding the existence of other (dubious) rationales,[25] the true distinguishing characteristic which permits discharge of the insurers' obligations in some circumstances and the general rule which prohibits it, is that in the former, but not the latter situation, the insurers are paying the full policy limits to the estate. In the run-of-the-mill case, where there is sufficient insurance coverage to pay all claims against the policy, a discharge of the insurer's obligation would provide it a windfall. Conversely, in a mass tort case where the aggregate liability on an insurance policy exceeds the policy limits, the insurer receives no windfall when it deposits those limits into the estate. It is only fitting then that it receive a discharge from further liability. The bottom line is

that a court will not allow an insurer to escape liability merely because the insured has filed bankruptcy.

This situation, where an insurer pays its policy limits into the estate to allow competing claims to the insufficient assets to be settled through the reorganization process, is the mirror image of a traditional interpleader.

> In a situation where multiple claimants seek the proceeds of an insurance policy, the insurer ... often files an interpleader action. The insurer deposits the proceeds (the "stake") with the clerk of the court, and the court is asked to determine who is entitled to the policy proceeds. The court's judgment settles the claims of the persons asserting rights to the proceeds and *discharges the insurer from liability.*

Jerry, § 98 (emphasis added).

> An interpleader proceeding is designed to protect a person, typically the insurer, against the rival claims which have been or may be made, thereby exposing him to the danger of being held liable in separate actions to each of the rival claimants, and to a lesser degree to spare the party so besieged from the expense and burden of establishing his defense to any of such rival claims. When interpleader is granted and service is properly effected upon the rival claimants, *the parties seeking the interpleader may obtain in the interpleader proceeding some form of judgment or order which will bar such claimants from asserting any claim against him inconsistent with the final determination* made on the merits of the interpleader action.

18 Couch on Insurance 2d § 74:250 (Clark Boardman Callahan Rev. ed. 1996) (citation omitted, emphasis added). This equitable remedy provides a benefit to the claimants as well as to the insurer. The general rule is that when there are multiple claimants

---

25. In *In re Forty–Eight Insulations, Inc.,* 133 B.R. 973, 22 B.C.D. 497, 25 C.B.C.2d 1629 (Bankr.N.D.Ill.1991), *aff'd* 149 B.R. 860 (N.D.Ill. 1992), Judge Barliant exposed the vulnerability of the *MacArthur* decision as not correctly distinguishing between the derivative rights (at most) of tort claimants and the independent rights of co-insureds like MacArthur in the debtor's insurance policies. In his view, while the former may

be precluded from suing an insurer that settles with the bankrupt estate, the latter may not. *Id.* at 977–78. This distinction was respected in other cases. *See, e.g., Zale, supra; Homsy v. Floyd (In re Vitek, Inc.),* 51 F.3d 530, 535 (5th Cir.1995) (contrasting claims of those whose rights are "derivative of the rights of ... insured" from those of "the other co-insured(s) or additional named insureds.").

against an insurance policy with inadequate limits to pay all the claims, "those persons who prosecute their claims against [the] insured and proceed against the insurance company are entitled to share in the fund, and after the company satisfies the judgments against the insured to the full extent of its liability, including the costs, it is discharged from further liability and ratable distribution is not required." 46A C.J.S. Insurance § 1409; 18 Couch, § 74:256 ("Among the principal evils which interpleader is intended to remedy are the difficulties posed for a liability insurer and the unfairness which might result to some claimants if certain claimants against the insured, and alleged tortfeasor, race to obtain a judgment or to negotiate a settlement which might appropriate all or a disproportionate part of the insurance proceeds before other claimants are able to establish their claims.") (citation omitted). Thus without an interpleader action, claimants are relegated to the commercial world's "survival of the fittest" or "to the swift go the spoils" regime as opposed to the more equitable proratable distribution regime common in bankruptcy and interpleader actions. By interpleading its policy limits, the insurer is in essence instituting a mini-bankruptcy case in the court presiding over the "estate"—in this case consisting of the cash proceeds of the policy. The end result of the process, of course, is a "discharge" of the petitioner/insurance company.

In the mass tort cases, including this one, the insurers are instituting interpleader relief. Today there are statutes, *e.g.*, 28 U.S.C. § 1335, and court rules, *e.g.*, F.R.Civ.P. 22, dealing with interpleader. But interpleaders became a creature of the law (or equity) long before the relief was codified. *See* 20 Appleman, § 11311 ("It is a common misconception that interpleader is a recent development—

indeed, something unique to federal procedure. To the contrary, it is an ancient remedy, equitable in origin, available both in state and federal courts. It does not depend upon a statute for its availability; but when a statute has been enacted, such as the federal law, it is remedial in nature and to be liberally construed.") (citations omitted); 45 Am. Jur.2d, Interpleader, § 1. Therefore, the lack of a pleading requesting relief explicitly under an interpleader statute or rule is unimportant. The relief requested was nevertheless in the nature of interpleader and it was within the Court's power to grant it. *See Silverman v. Hartford Accident & Indem. Co. (In re Hronek)*, 563 F.2d 296, 298 (6th Cir.1977) (Where an insurer and a trustee settled a disputed liability by the insurer tendering $2,500 to the estate, leaving it for the bankruptcy court to decide which of the two competing claims had priority, the "suit was, in substance, an interpleader action with Hartford as the stakeholder.").[26]

For these reasons, the Court had the authority to issue the orders approving the settlements in the form submitted.

### D. *Due Process—Notice*

The TCC also objected to the proposed settlements because they purport to release their constituents' alleged claims against the insurers even though the claimants are not parties to the settlements, and the Debtor provided them no individualized notice of the corresponding motions or of the hearings thereon. Absent such notice to all such persons, the TCC argued, court approval of the settlements would violate their constitutional right to due process.

The short answer to this issue, of course, is that the claimants have no cause of action against the insurers and so the releases re-

---

**26.** The TCC would likely argue that interpleader is not available here because the settling insurers are not paying all of their policies' limits, but only a negotiated sum less than that amount. But once the insurers and the insured have settled their business disputes by means of adjusting their policies' limits, the limits for purposes of this interpleader are the new, negotiated ones.

So long as the settlements were fair and equitable, negotiated in good faith—which the Court has already determined—the reduction in the limits are valid exercises of the parties' freedom to contract, which are not reversible by the creditors of either party. And one must remember that the issue here is the power of the Court to

lease nothing.[27] But if one assumed that some of the tort claimants who did not receive notice do in fact hold a protected property interest in the settled policies, the TCC's argument still fails.

In the much-cited case of *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the Court made the following comments regarding the kind of notice contemplated by the due process clause:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is *notice reasonably calculated, under all the circumstances, to apprise interested parties* of the pendency of the action and afford them an opportunity to present their objections.... The notice must be of such nature as reasonably to convey the required information.... [I]f *with due regard for the practicalities* and peculiarities *of the case* these conditions are *reasonably* met, the constitutional requirements are satisfied.

> . . . . .

> The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected ... or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the *feasible* and customary substitutes.

> . . . . .

> This Court has not hesitated to approve of resort to publication as a customary substitute in a[ ] class of *cases where it is not reasonably possible or practicable* to give more adequate warning. Thus it has been recognized that in the case of persons missing or unknown employment of an in-

direct and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights.

> . . . . .

> *Those beneficiaries* [of trust accounts that were judicially settled] ... *whose interests* or whereabouts *could not with due diligence be ascertained* come clearly within this category.... However great the odds that [the statutorily-mandated method of] publication will never reach the eyes of such unknown parties, it is not in the typical case much more likely to fail than any of the choices open to legislators endeavoring to prescribe the best notice *practicable.*

> Nor do we consider it unreasonable for the state to dispense with more certain notice to those *beneficiaries whose interests* are either conjectural or future or, *although they could be discovered upon investigation, do not in due course of business come to knowledge of the common trustee.* Whatever searches might be required in another situation under *ordinary standards of diligence,* in view of the character of the proceedings and the nature of the interests here involved we think them unnecessary. We recognize the *practical difficulties and costs* that would be attendant on frequent investigations into the status of *great numbers of beneficiaries,* many of whose interests in the common fund are so remote as to be ephemeral; and we have no doubt that such *impracticable and extended searches are not required in the name of due process.*

> . . . . .

> Accordingly we overrule appellant's constitutional objections to published notice insofar as they are urged on behalf of any *beneficiaries whose interests* or addresses *are unknown to the trustee.*

---

issue a discharge, not the wisdom of the negotiated payments.

**27.** The notice requirement spoken of in *Hayes* and *Cloud* is also something less than that required by constitutional due process. When a

person does not have a vested property interest at risk, due process concerns are not implicated. *See W.A. Foote Memorial Hospital v. Public Health Dept.*, 210 Mich.App. 516, 524, 534 N.W.2d 206 (1995).

As to *known* present beneficiaries of known place of residence, however, notice by publication stands on a different footing. Exceptions in the name of necessity do not sweep away the rule that *within the limits of practicability* notice must be such as is reasonably calculated to reach interested parties. Where the names and post-office addresses of those *affected by* a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency.

. . . . .

We need not weigh contentions that a requirement of personal service of citation on even the large number of known ... beneficiaries would, by reasons of delay if not of expense, seriously interfere with the proper administration of the fund ... [P]ersonal ... service is [not] required under the circumstances. This type of trust presupposes *a large number of small interests. The individual interest does not stand alone but is identical with that of a class. The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries. Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all since any objection sustained would inure to the benefit of all. We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable.*

*Id.* at 314–19 (emphasis added).

This extended excerpt from *Mullane* suggests two general rules which are potentially relevant to this case. One is that actual notice to all interest holders is not required if (1) there are a great many of them; (2) the interests are such that a sustained objection by any one individual would inure to the benefit of the other interest holders; (3) the interests are small; and (4) most interest holders do in fact receive notice. The Debtor argued in effect that it is entitled to a dispensation based on these considerations. *See* Dow Corning Corporation's Trial Brief in Support of Motions to Approve Compromises With Various Insurers, p. 14. But while the first two of the foregoing criteria would certainly seem to be met in this case, the evidence presented is not wholly convincing that the interests involved are "small," or that "most" tort claimants received notice of the pertinent motion and/or hearing.[28]

The second rule emanating from *Mullane*, however, is one which is availing to the Debtor. *Mullane* supports the proposition that, even if the party proposing to dispose of an asset knows that some subset of persons holds a constitutionally protected property interest in the asset, the party need not endeavor to identify who those persons are if doing so ' would be impractical. *Cf.*

---

28. The Debtor served each member of the TCC. Eight of the nine members of that committee are attorneys who represent hundreds or thousands of tort claimants. The ninth is the head of Command Trust Network, a support group for breast implant recipients whose stated mission is to provide accurate and adequate information about implant issues to those who wish to make informed decisions. The Debtor also served the attorneys for the TCC. It served the dozens of attorneys who comprise the various Plaintiffs Steering Committees in the various multi-district litigation cases, who collectively represent a significant portion of the tort claimants in this case. It served each attorney and claimant who filed a request for notice in the case. What it did not do is serve each person who registered in *In re: Silicone Gel Breast Implants Product Liability Litigation* MDL 926 (N.D.Ala.) It has been stated that more than 440,000 people "registered." However, in addition to some who might have been interested in the motions, registrants include persons who:

(1) merely wish to preserve any possible claim but do not wish to currently assert one;

(2) received breast implants not manufactured, and not containing silicone gel supplied by the Debtor;

(3) received the Debtor's breast implants after 1985 and as such are not impacted by or interested in litigation about insurance policies, as are involved here, for occurrences predating 1986.

The Debtor asserted that, consistent with *Mullane*, it was not required to send notice to each person on such a vastly over-inclusive list. Instead, it argued, it gave notice which was far more helpful and appropriate: it gave notice to the people who were most likely to object.

Because the TCC's only constitutional argument was that nothing short of notice mailed to each and every tort claimant was required, there is no need to address the question of whether the Debtor's notice was sufficient as measured against a less stringent standard.

*Chemetron Corp. v. Jones,* 72 F.3d 341, 346 (3rd Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 1424, 134 L.Ed.2d 548 (1996).

In this regard, the Debtor pointed out that only some of the hundreds of thousands of implant plaintiffs could even conceivably stake a claim against the settling insurers. *See* Debtor's Trial Brief at pp. 13–14. It explained:

> [I]n order to determine which tort claimants might potentially have a claim covered by these policies so as to be entitled to receive notice, the Debtor would have had to determine, for each individual tort claimant (1) the amount of the claim that would ultimately be liquidated; (2) whether the claimed implant or injury occurred during an applicable policy period; (3) whether the policies underlying the appropriate policy coverage have been or would be exhausted; (4) whether the Insurers' policies in question have coverage remaining which has not been exhausted; and (5) whether the claim is not otherwise excluded from coverage under the policies.

Given these difficulties, and the time constraints which it was facing, the Debtor was not constitutionally required to individually notify each and every protected-interest holder. Thus even if the rather vast universe of implant claimants includes persons with a property interest in the insurance policies, the TCC's contention that the Debtor violated the due process clause by failing to notify all persons comprising that universe is without merit.

 Finally, even if all tort claimants had a property interest in the insurance policies protectable as a matter of due process, and even if the process provided to some of them was less than the amount "due," these claimants are not in reality prejudiced by an order releasing these interests. It is black letter law that a judgment affecting a person's property may be collaterally attacked if that person was not given adequate notice and opportunity to be heard prior to the entry of the judgment. *See,* 4 Wright & Miller, *Federal Practice and Procedure:* Civ.2d § 1074 (1996) ("[F]ailure to provide defendant with proper notice and an opportunity to be heard will subject a judgment to

collateral attack."). Therefore, in the event that both of this Court's prior rulings are in error, the tort claimants who did not get proper notice ought to be free in any. subsequent proceeding to argue that this Court's order, which provides for the release of their claims as against the insurers, is void.

In summary, the Court concludes that the settlements should be approved on the merits; that most likely the tort claimants have no property interest; if they have a property interest, the release of the interest was a valid exercise of this Court's authority pursuant to § 363(f), interpleader and Bankruptcy Rules 9019 and 6004(c); that the tort claimants received adequate notice of the release of those interests; and that if all of this is incorrect, and if any claimant did not get actual notice, he or she has the right to collaterally attack it.